30728. MUTUAL LIFE INSURANCE COMPANY OF NEW YORK *v.* BINION.

DECIDED MARCH 1, 1945. REHEARING DENIED MARCH 15, 1945.

*Grover Middlebrooks, Louis W. Dawson,* for plaintiff in error.
*Marion Ennis,* contra.

FELTON, J. Dr. Richard Binion sued Mutual Life Insurance Company of New York to recover certain monthly disability payments alleged to be due for the months of September, October, November, and December, 1943, together with a premium paid under protest on October 4, 1943, all in the principal sum of

$1,422.69, with interest thereon, together with damages and attorney's fees, on a life-insurance policy No. 4,136,350, issued on the life of the plaintiff by the defendant in the amount of $29,110, dated April 5, 1939, under the following provisions: "Section 3. Benefits in event of total and permanent disability before age 60. *Total disability*—Disability shall be considered total when there is any impairment of mind or body which continuously renders it impossible for the insured to follow a gainful occupation. *Benefits* (b) Waiver of premium—The company will also after receipt of such due proof, waive payment of each premium as it thereafter becomes due during such disability." The jury returned a verdict in favor of the plaintiff for principal, interest, attorney's fees, and damages. The defendant filed a motion for a new trial which was overruled. To this ruling the defendant excepts. The questions raised are sufficiently indicated in the opinion. The insured's testimony was in substance as follows: He began the practice of medicine at Sparta, Georgia, in 1916, and moved to Milledgeville, Georgia, in December, 1918, and practiced there till February 14, 1941. The policy sued on was issued April 5, 1929. In 1937 he took stock of himself and decided that he had to quit work entirely or reduce to part time. He decided on part-time work. He resigned as chief medical examiner for the Mutual Life Insurance Company of New York. He resigned all other insurance appointments except some compensation-insurance appointments which involved surgery. He retired from the practice of medicine and surgery on February 14, 1941, so he could live. He had high blood pressure, heart disease, Bright's disease, arthritis of the spine, general hardening of the arteries, and impairment of vision. When he filed his claim for disability the company had him to report to Dr. James E. Paullin. The company paid him permanent and total-disability benefits from February 14, 1941, through August 14, 1943. He complied with every request for information made by the company. On September 15, 1943, the company discontinued payments and demanded further premiums which he paid under protest. Since February 14, 1941, he had performed no surgery and had not pursued a gainful occupation. He had not derived a dime of income from the practice of medicine, surgery, or any other occupation since that date. About 1929 he formed a partnership with Dr. W. M. Scott which lasted about

three years. Then Dr. John Mobley worked for him on a percentage basis for about a year or two. He and Dr. Scott worked under the name of Milledgeville Clinic, and when the partnership dissolved he adopted the Richard Binion Clinic, a trade name, and also operated the Baldwin Memorial Hospital. Dr. O. C. Woods and a number of other doctors were taken into the Richard Binion Clinic on a salary basis. When he practiced medicine and surgery he was chief surgeon and head of the Richard Binion Clinic and Baldwin Memorial Hospital. When he ceased to practice Dr. Woods became head of and responsible for the clinic and hospital. All the money collected by the doctors on the clinic went into the bank in that name, Richard Binion Clinic, and at the end of the month if there was any money left over, it became his, after all the expenses of the clinic and hospital were paid. They paid the expenses and deficit from the hospital, which was continuous over twenty-four years, never having earned a dime in any one year. The deficit in the hospital for the poor who could not pay was paid out of this money. When Dr. Woods was taken into the clinic he was employed by the insured on a salary basis, as were other doctors employed. After January 1, 1940, bills were sent out from the clinic as such and not from the doctors individually. Dr. Binion could not name all the employees of the clinic since 1934, nor the ones employed at the time of the trial. Miss Doster, bookkeeper for the clinic, had been in his employ for ten or twelve years. She was also bookkeeper for the Baldwin Memorial Hospital. After he retired she looked after the business of the hospital until he could procure somebody to do it. She bought the groceries and supplies, paid out money, wrote checks, and took in every dollar collected by the hospital and the clinic. She had signed his checks for the past ten years. He had various other assistants from time to time. He had a new helper at the time whose name he did not know. The buildings of the hospital were built at three different times. Besides the office employees, the hospital employed forty to fifty people, including nurses, orderlies, kitchen help, porters, etc. The capacity of the hospital was seventy to seventy-five beds. All the moneys from the hospital services were deposited in a bank account in the name of Baldwin Memorial Hospital, his trade name. The young ladies referred to have authority to sign checks against that account. Miss Doster

176

has had authority to sign his personal checks since 1941. With reference to checks of the clinic he had never kept books. After payment of expenses of the clinic if any money was left over it was turned over to him individually. The hospital had never paid him a dime. He put from one to two thousand dollars a month into the hospital. Business picked up in 1943, but not from any efforts of his. He was chairman of the Board of Health of Baldwin County, and had been since 1929 or 1930. He was also vice-chairman of the Board of Social Security of the State of Georgia. He had not attended any surgical or medical conferences since his retirement, February 14, 1941. With reference to the advertisement of his retirement stating that he would continue in an active advisory capacity to the hospital, it was his intention to do that if he had been able. When he made the statement it was conscientiously made because what he had gotten, the people whom he had served helped him make. He had not advised the hospital about anything except matters pertaining to his investment as owner of the hospital. He had taken no part in getting contracts from any concern for the furnishing of hospital services by his hospital. He understood that Dr. Woods had the contract with the Reynolds Corporation for the furnishing of medical services to its employees. He did not talk to Congressman Vinson in an effort to help him get it. He talked to him in relation to the contract, but was not instrumental in his getting it. Dr. Woods got it because of his ability, and with the help of Congressman Vinson. From September to December, 1943, he had an office in the hospital building. He went there most of the time twice a day. Sometimes he did not go there for six weeks, and at another time for thirty-one days, and went very infrequently in the last year. His home is two and a half blocks from the hospital. It had been the practice for some employee to give him a report every afternoon, showing patients admitted to the hospital, the number of patients in the hospital, the amount of money collected by the individual doctors, the names of the patients, and from whom money was collected, the amount of money on hand for the clinic for that day and the preceding days, the amount of money on hand for the hospital, and every disbursement made by the hospital. He had gotten that report every day for fifteen years. That was the only way he had to keep up with it. If the doctors employed were to quit no one would operate the clinic. He could not operate it.

Dr. O. C. Woods testified in substance: He had practiced with Dr. Binion, the insured, since 1930. He made an examination of the insured when he quit practicing medicine. At that time he had high blood pressure, an enlarged heart, rheumatism in his wrist, neck, and spine, and had chronic kidney trouble and some hardening of the arteries. At that time in his opinion the insured was totally and permanently disabled. From an examination in the last ten days the insured was still so disabled. The insured had had no conferences with him with reference to operations or treatment of patients since February 14, 1941. Since February 14, 1941, there had been an increase in the number of patients coming to the Richard Binion Clinic which he would attribute to the increase in the population on account of war projects in Milledgeville. He and the insured never discussed business matters. By total and permanent disability he meant so far as practicing medicine was concerned. He would not advise worry or responsibility for the insured. The operating of the clinic part of the hospital is a responsible job. Dr. Charles Fulghum gave similar testimony. The insured's net income for the year 1943 was $33,597.18; his income from the clinic for the months of September, October, November, and December, 1943, was $13,493.85; the income from the hospital for November and December, 1943, was $2,022.62, total, $15,516.47. Total earnings from the clinic and hospital from January 1, 1944, to May 31, 1944, were $21,374.43. The income from these sources from 1929 through 1942 was as follows: 1929, $14,428.73; 1930, $14,429.26; 1931, $9,419.44; 1932, $2,-251.21 (the said return showed a loss of $1,822.70 from operating the hospital); 1933, $4,445.07 (the said return showed a loss of $874.26 from operating the hospital); 1934, $12,757.77 (the said return showed a loss of $1,536.34 from operating the hospital); 1935, $3,424.05; 1936, $5,695.59; 1938, $4,083.43; 1939, $15,-238.67; 1940, $20,977.10; 1941, $10,605.47; 1942, $12,160.67.

■ There was other evidence, but there was no evidence showing that the insured did any work in connection with the operation of the clinic and hospital except to receive daily reports. Even this activity can not reasonably be related to the insured's putting forth any effort mentally or physically. It would more appropriately be classified as a check on investments rather than active operation of a business. Hiring others to operate a business is not personal

operation of the business. The fact that the insured is able to go to his office or place of business for a short time each day does not render disability less than total if in fact he could do no work there. Turner v. Fidelity & Casualty Co., 112 Mich. 425 (70 N. W. 898, 38 L. R. A. 529, 67 Am. St. R. 428); Thayer v. Standard Life & Accident Ins. Co., 68 N. H. 577 (41 Atl. 182); Baldwin v. Fraternal Accident Assn., 21 Misc. 124 (46 N. Y. Supp. 1016). If one is obliged to employ others to manage his business and can give personal attention to only a few details the disability must be regarded as total. U. S. Casualty Company v. Hanson, 20 Colo. App. 393 (79 Pac. 176). At the time of the issuance of the policy the insured was a physician and surgeon. He subsequently continued such practice, and also operated the clinic and hospital. The evidence shows conclusively that he had completely stopped the practice of medicine and surgery, and had stopped all activity in operating the clinic and hospital except to receive daily reports. Under the definitions of total disability laid down by the Supreme Court, the finding of total disability was demanded by the evidence. *Mutual Life Insurance Company* v. *Barron,* 198 *Ga.* 1 (30 S. E. 2d, 879). Under the rulings in the *Barron* case the policy sued on is one insuring against loss of earning capacity and not against loss of income. The fact that the insured's income was more than usual for the time in question is immaterial if his personal effort did not produce it. The finding that the insured, during the time in question, was totally and permanently disabled within the meaning of the policy provisions, was demanded.

■ In view of the ruling in the preceding division of this opinion, error in the charge, if any (and we do not hold that there was error), was harmless.

■ The insurance company conceded that the insured became totally and permanently disabled on February 14, 1941, and paid disability benefits from then until September, 1943. In the absence of any explanation why it discontinued the benefit payments, and of the information upon which it acted in so doing, the finding for damages and attorney's fees was not unauthorized as a matter of law.

The court did not err in overruling the motion for a new trial.

*Judgment affirmed. Sutton, P. J., and Parker, J., concur.*