**Richard HELUS, Plaintiff,**

v.

**EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES, and Does 1 through XX, Defendants.**

No. C 02–4779 MHP.

United States District Court,
N.D. California.

March 18, 2004.

---

---

## MEMORANDUM AND ORDER

PATEL, Chief Judge.

Plaintiff Richard Helus brings this action against defendant Equitable Life Assurance Society ("Equitable") and Does 1

to 20, alleging that Equitable breached its disability income insurance contract with him and acted in bad faith by declaring he was not disabled and threatening to stop benefit payments even though he could not resume the duties of his prior occupation. Plaintiff amended his complaint on June 27, 2003. Now before the court is defendant's motion for summary judgment, motion to dismiss and motion to strike. After having considered the parties' arguments and submissions, and for the reasons set forth below, the court rules as follows.

*BACKGROUND* [1]

Equitable issued a disability income insurance policy to Helus that was effective July 2, 1990. At the time the policy was issued, Helus was the owner and president of his own construction company, Helus Construction. In July 1992, the company suffered a severe blow when the owner of a $4.5 million project refused to pay Helus Construction for its work as a general contractor. Helus was forced to fire all his employees and could not pay his sub-contractors, which resulted in extended litigation and Helus's eventual bankruptcy. On December 21, 1992, Helus submitted a claim for benefits to Equitable for a disability he described as "[s]tress and depression due to ongoing non payments of projects. Unable to handle the pressures." Helus claimed that he became disabled on July 1, 1992. As part of his disability claim, Helus submitted an attending physician's report with a diagnosis of "major depression, single episode, severe, without psychotic features." The psychiatrist, Dr. William Blakey, stated that Helus was "totally disabled by virtue of his depression," which was "primarily

. . . the result of work stress and business difficulties." Blakely estimated that Helus would be "totally disabled for 3–6 months probably." Equitable began paying benefits to Helus in November 1993, in the amount of $9100 per month.

During the time he claimed a disability, Helus worked in several volunteer and paid positions. In 1994 and 1995, Helus was a temporary construction manager for T.D. Service Financial Corporation, advising his employer on several projects. From 1991 to 1998, Helus worked for the San Bernardino County Sheriff's Department ("SBSD") as a Level I Reserve Officer. In addition to volunteering in search and rescue, Helus began working as a paid landscape engineer for the SBSD in November or December of 1996. He became a full-time paid training specialist for SBSD in 1997, leaving in 1998 when he moved to Northern California. In 1999, Helus worked as a part-time volunteer for the Clearlake Oaks Fire Department ("COFD") for six months. Helus moved to Reno, Nevada in 2000 and began working as a project manager for Reno Construction on August 1. He quit three months later. He then became a quality control manager for Frontier Contracting on November 13, 2000 but quit in April after five months. Most recently, Helus returned to California and worked as a "quality control manager, project manager and/or safety manager" for All Cities Enterprises for a few months until he was fired in March 2002.[2]

Equitable sent a field investigator to meet with Helus in November 1999. Helus reported that he had worked for SBSD as a training specialist and had also volun-

---

**1.** All facts in this section are contained in the parties' joint statement of undisputed facts, unless otherwise cited.

**2.** Helus also worked in a few other positions during this time: as a Level I Reserve Officer for the El Monte Police Department from

1977 to 1992 or 1993, as a security guard for an apartment complex in 1997, and as a bodyguard in 1998. As Equitable does not argue that Helus performed any of the duties of his own occupation in these positions, the court will not address them in this motion.

teered with COFD. Def.'s Exh. 17, at 5. The next month, the investigator interviewed the Fire Chief of COFD, James Burton, about Helus's activities as a volunteer. According to the investigator's report, Burton stated that Helus performed all the normal duties of a volunteer, such as fighting fires and lifting patients, but COFD "got rid of him" because he had personality conflicts with other people at COFD and had difficulty accepting orders. Def.'s Exh. 18, at 2. The investigator also obtained a medical report from COFD, in which Helus affirmed under penalty of perjury that he did not have a psychiatric disorder or any other nervous disorder, and that he was not taking any medications. Def.'s Exh. 19, at 1.

Concerned about the information from these interviews, Equitable sent Helus in July 2000 to a psychologist, Milton E. Harris, and a psychiatrist, Emily Keram, for Independent Medical Examinations ("IMEs"). Dr. Harris conducted a psychometric evaluation, including a multiphasic personality test, and reported the results to Dr. Keram. In her report to Equitable, Dr. Keram stated: "Helus's psychiatric symptoms currently limit his occupational function. Specific limiting symptoms include his level of anger, irritability and frustration intolerance, his impairment in concentration and memory, and his sleep disorder with resulting anergia. These symptoms put him at significant risk for re-development of a major depressive episode if he were forced to return to the workplace at the current time." Def.'s Exh. 21, at 11. According to Dr. Keram, "Helus's personality traits also render him vulnerable to developing serious psychiat-

ric symptoms when faced with anxiety provoking situations in which he might experience failure or loss of control." Id. Dr. Keram concluded that "Helus will require up to an additional eighteen to twenty-four months of treatment before he will successfully return to full-time occupational functioning." Id. at 12.

David Lovejoy, a medical consultant for Equitable, discussed the results of the examinations with both Dr. Keram and Dr. Harris. In his telephone log of the conversation with Dr. Keram on September 25, 2000, Lovejoy prepared at least two versions for Dr. Keram's signature. In one, he wrote: "Dr. Keram indicated that she felt strongly about the insured's risk of future disability (Dr. Keram indicated that she was aware of the differences between current disability and risk of disability) and self-harm if he were forced to make an immediate return to work with an abrupt discontinuation of benefits. Dr. Keram felt that 18 to 24 months of psychotherapy would be optimal to strengthen deficient coping mechanisms and make an adequate transition back to the workforce." Plf.'s Exh. E at 1. Dr. Keram signed this version. Id. In a second version, Lovejoy replaced the second sentence with the following: "However, she stated that with eight months of further therapy, the insured should be able to strengthen deficient coping mechanisms and make an adequate transition back into the work force." Def.'s Exh. 23, at 1. Dr. Keram returned the log without a signature, but circled "eight months" and noted: "I recommended 18–24 months of tmt, but felt that I could not object to the ins. co. offering a settlement of 8 mos of payment." Id.[3]

---

3. In a third version Helus obtained from Dr. Keram during her deposition, the report replaced the second sentence with the following two sentences: "Although Dr. Keram felt that 18 to 24 months of psychotherapy would be optimal to strengthen deficient coping mechanisms and make an adequate transition back to the workforce, she felt that she could not object to an offering of eight months of benefits to aid with the insured's efforts to return to work. However, she stated that with eight months of further therapy, the insured should be able to strengthen deficient coping mechanisms and make an adequate transition back

According to a telephone log, Helus was informed by Equitable on September 27, 2000 that Dr. Harris and Dr. Keram "did not find him to be disabled—no axis I diagnosis." Pl.'s Exh. Z, at 1. The claims handler recorded that she "offered the insured 8 months of disability payments per IME dr." *Id.* On October 25, 2000, Equitable wrote Helus that "we have two independent medical evaluations that were performed and each of them indicated that you are not currently disabled." Def.'s Exh. 25, at 1. Equitable offered Helus eight more months of benefits, an offer "made to be of service to you." *Id.* On January 1, 2001, Equitable transferred administration of Helus's claim from Unum-Provident Corporation to Disability Management Services. Davis Dec., Exh. 2 ¶ 3. Equitable informed Helus on May 15, 2001 that he would receive an additional month of benefits "as a gesture of good will" while Equitable reviewed his current medical records "to determine if there has been any change in your medical condition that may justify the continued payment of benefits." Def.'s Exh. 28, at 1. Concluding that "[b]ased on the information in our file, which includes all of the information relied upon by Equitable in coming to its original decision, we lack evidence to support payment of total disability benefits," Equitable paid Helus his last month of benefits on June 22, 2001. Def.'s Exh. 29, at 2.

*LEGAL STANDARD*

I. *Amendments to Pleadings*

■ Leave to amend pleadings is required except when the amendments are made "as a matter of course" or by consent of the other party. Fed.R.Civ.P. 15(a). When the deadline set by a pretrial scheduling order has passed, leave to amend is granted only when there is "good cause." Fed.R.Civ.P. 16(b). The "good cause" inquiry "primarily considers the diligence of the party seeking the amendment," but "the existence or degree of prejudice to the party opposing the modification" may also be considered. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir.1992).

II. *Summary Judgment*

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The moving party for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. *Id.*; *see also Gasaway*

---

into the work force." Pl.'s Exh. J, at 1. Dr. Keram did not sign the report but noted: "Again, I recommended 18–24 mos of treatment. The ins co wanted to offer an 8 mos lump sum payment and asked what I thought. I told Dr. Lovejoy that it's not a psychiatric issue. It's for the patient to decide." *Id.*

*v. Northwestern Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th Cir.1994). Inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *Masson v. New Yorker Magazine*, 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

*DISCUSSION*

The court first addresses whether Helus should be given leave to amend his complaint, and then reviews whether summary judgment should be granted on Helus's claims for breach of contract, breach of the covenant of good faith and fair dealing and prayer for punitive damages.

I. *Amending the Complaint*

The original complaint stated three causes of action: breach of contract, violation of Nevada statutes and regulations on the insurance industry, and breach of the covenant of good faith and fair dealing. On June 16, 2003, this court dismissed the second cause of action because it found that Nevada did not have the requisite interest in regulating an insurance contract that was formed and carried out in California. The court gave Helus leave to amend his breach of contract claim to conform to proof but denied his request to amend the complaint by adding new claims, including a cause of action under California's Unfair Competition Law, Cal. Bus. & Prof.Code § 17200 *et seq.*, for violations of section 790.03 of the California Insurance Code.

■ Helus filed an amended complaint on June 27, 2003. In the amended complaint, Helus conformed the breach of contract claim to proof by alleging that Equitable ceased disability payments in June 2001. First Am. Compl. ¶ 25. Helus also

added a claim for anticipatory breach of contract, in which he alleges that Equitable repudiated the contract when it determined in October 2000 that Helus was not disabled. *Id.* ¶¶ 17–21. Finally, Helus amended his bad faith claim to include section 790.03 of the California Insurance Code. *Id.* ¶¶ 31–32 & 34. In his prayer for relief, Helus added disgorgement, declaratory relief and injunctive relief.

Equitable brought a motion to dismiss the anticipatory breach of contract claim and a motion to strike the references to the California Insurance Code and additional claims for relief. Helus does not contest the motion to dismiss.[4] Pl.'s Opp'n Mots. Dismiss & Strike, at 3. Therefore, this court will only address whether Helus should be granted leave to amend his bad faith claim and add relief.

Equitable contends that leave should be denied, as the scheduling deadline is long past and there is no good cause to amend at this date. Helus replies that its amendments simply conform the complaint to applicable law, given that the parties recently stipulated that California law should apply to this action. The scheduling deadline for filing an amended pleading in this action was July 20, 2001. Two years later, Helus wishes to substantially amend his bad faith claim while Equitable's motion for summary judgment is pending. Helus's amended complaint alleges that an insurer who violates section 790.03 breaches the implied covenant of good faith and fair dealing. As the California jury instruction on this issue makes clear, however, violations of section 790.03 are simply one factor that the jury *may* consider in determining whether an insurance company acted in bad faith.[5] The original com-

**4.** Citing *Hangarter v. Paul Revere Life Insurance Co.*, 236 F.Supp.2d 1069, 1087–89 (N.D.Cal.2002) (Larson, M.J.), Helus contends that he should be allowed to request future disability benefits if he prevails on his bad

faith claim. This is a question of damages, separate from whether Helus can state a claim for anticipatory breach.

**5.** The jury instruction states:

plaint adequately states a claim for breach of the covenant of good faith and fair dealing under California law, and thus there is not good cause for amending this claim.[6]

Therefore, this court denies Helus leave to amend his complaint except as already permitted, to conform to proof on the breach of contract claim. Because Helus does not explain why he should be allowed to plead new forms of relief, the court also denies leave to add relief. For the purposes of the pending summary judgment motion, the court will look to the original complaint for all allegations concerning bad faith, and to the amended complaint for those allegations concerning Helus's breach of contract claim.

## II. Breach of Contract

Helus contends he is totally disabled under the terms of his policy with Equitable due to depression and stress-related illness. In this motion, Equitable argues that it did not breach its contract with Helus when it stopped payments in June 2001 because Helus had worked in positions where he engaged in some of the duties of a construction owner. Equitable also claims two psychiatric evaluations conducted in November 2001 demonstrate Helus is not totally disabled. In response, Helus contends that his difficulties with work prove he is totally disabled, and relies on the IME report by Dr. Keram as well as a May 2001 psychiatric evaluation that found he could not perform the duties of his occupation.

### A. The Policy

As an initial matter, the court must determine the reach of the Equitable policy at issue in this action. The policy provides in relevant part: "If disability: (1) starts while this policy is in force; and (2) continues beyond the Elimination Period; we will pay the Monthly Income for each month of the period of disability that extends beyond the Elimination Period." Def.'s Exh. 1 at 6. A disability is defined as "total disability," which "means your inability due to injury or sickness to engage in the substantial and material duties of your regular occupation." Id. at 5. "Sickness total disability" is "disability caused or contributed to by sickness or by ... bodily or mental infirmity." Id. With exceptions, benefits end when the insured turns 65. Id. The policy also has a residual disability rider that provides for payment of the difference between the insured's monthly income and current income when the insured is unable "due to injury or sickness to perform (1) one or more of the substantial and material duties of [his] occupation; or (2) the substanial [sic] and material duties of [his] occupation for as much time as is usually required to perform them." Id. at DI 86–42.

The parties have stipulated that California law applies to this action. California courts look first to the plain meaning of the language when interpreting insurance contracts. Reserve Ins. Co. v. Pisciotta, 30 Cal.3d 800, 807, 180 Cal.Rptr. 628, 640 P.2d 764 (1982). If the language

---

Evidence that the insurer's handling of the insured's claim was or was not in general compliance with applicable statutory guidelines is relevant in determining whether the insurer's conduct was reasonable. However, the insurer's duty of good faith is as I have already stated to you. That duty is not necessarily controlled by the general statutory guidelines. Accordingly, whether the insured acted in compliance with statutory guidelines is simply one factor for you to consider in determining whether the insurer acted in good faith or bad faith.

2 Cal. Jury Instr. Civil 12.94 (9th ed.).

6. Helus appears to be shoehorning section 790.03 into his bad faith claim to gain what the court specifically told him it would not allow—a section 17200 cause of action.

is ambiguous, the courts will interpret it against the insurer to "protect the insured's reasonable expectation of coverage in a situation in which the insurer-draftsman controls the language of the policy." *Reserve Ins. Co.,* 30 Cal.3d at 808, 180 Cal.Rptr. 628, 640 P.2d 764. The language "must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." *Waller v. Truck Ins. Exch., Inc.,* 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995). Language is ambiguous if it can be construed in two reasonable ways. *Id.*

▇ Relying on *Dym v. Provident Life & Accident Insurance Co.,* 19 F.Supp.2d 1147 (S.D.Cal.1998), Equitable contends that an insured is only totally disabled if he cannot engage in *any* substantial and material duties of his regular occupation.[7] In *Dym,* the district court applied California law to hold that a total disability provision identical to the one at issue here, when read in the context of the entire contract, did not cover an insured who could perform one of the substantial and material duties of his occupation. *Id.* at 1150. The *Dym* court reasoned that an insured who could still engage in one of these duties was not totally disabled by the plain meaning of the language, since the contract provided residual disability coverage for an insured unable to perform "one or more" of his substantial and material duties. *Id.*

Helus argues that this court should interpret his policy differently than did the court in *Dym,* even though the definitions of total disability and residual disability are identical. First, Helus contends that the residual disability provision should not be used to interpret the definition of total disability because the residual provision occurs in a rider to the policy, for which Helus paid an additional premium. It would be unfair, Helus maintains, to limit the definition of total disability using a rider Helus reasonably expected would expand his coverage. The court finds no merit in this argument. The general provisions of the policy make clear that the entire contract consists of the policy and "all attached papers." Def.'s Exh. 1 at 9. It is a standard rule of contract interpretation that disputed language should be viewed in the context of the entire contract. By paying for the rider, Helus gained the certainty that he would receive benefits even if the sickness or accident affected only one of his duties or limited his output.

Second, Helus contends that there is language in the rider that prohibits the court from interpreting the total disability provision together with the residual disability provision. Helus relies on *Stender v. Provident Life & Accident Insurance Co.,* 2000 WL 875919 (N.D.Ill. June 29, 2000), which found *Dym* inapplicable because the residual provision at issue specifically stated: "Nothing in this provision limits the policy definition of 'Total Disability.'" *Id.* at *10. Helus points to the following statements in the rider: "This does not change the definition of disability" and "This rider does not replace the other benefits payable under this policy." Def.'s Exh. 1, at DI 86–42. When read in context, neither of these provisions prohibits using the rider to interpret the rest of the policy. The first occurs under the heading "Percent Loss of Monthly Earnings," and simply means that the percent of earnings loss will not affect whether someone is considered disabled. The second statement is found in "Concurrent Total and Residual Disabilities," which makes

---

7. Equitable also cites *Dietlin v. General American Life Insurance Co.,* 4 Cal.2d 336, 49 P.2d 590 (1935) for the same proposition. In *Diet-* *lin,* however, the policy defined total disability as "any and every kind of duty pertaining to his occupation." *Id.* at 341, 49 P.2d 590.

clear that an insured who is totally disabled will receive total disability benefits, not residual benefits.

Third, Helus contends that coverage for "presumptive total disability"—defined as loss of sight, speech, hearing, use of both hands or both feet, or use of one hand and one foot—implies that Equitable's restrictive reading of total disability is incorrect. Since someone who has one of these injuries could possibly engage in a substantial and material duty of his occupation, it would be inconsistent to require Helus to show he could not perform all of the duties of his occupation. The court is not convinced. The definition of "presumptive total disability" makes clear that the insured need not prove whether he is unable to engage in any or all of the substantial and material duties of his occupation; the insured may "engage in any occupation" and still be considered presumptively disabled. Def.'s Exh. 1, at DI 86–42. Thus, the court will not use this provision to interpret the phrase "substantial and material duties" in the definition of total disability.

The court finds that the plain meaning of "inability to engage in the substantial and material duties of your regular occupation," when read together with the residual disability provision, is the inability to perform *all* of the duties. The duties must still be both substantial and material, however. In *Dym*, the court made clear that the duty at issue—performing minor surgery—was admitted by the insured to be an "important duty" for his occupation as a gynecologist, "a duty to which he previously devoted a substantial portion of his practice." *Dym*, 19 F.Supp.2d at 1150. Interpreting a similar occupational disability policy, a Massachusetts district court found that the relevant inquiry was whether the duty at issue was "incidental" or "important." *Giampa v. Trustmark Ins.*

*Co.*, 73 F.Supp.2d 22, 29 (D.Mass.1999) (leaving this question for the jury). The court therefore turns to whether Helus can perform the substantial and material duties of his occupation.

### B. *Helus's Occupational Duties*

■ Helus has described the duties of his occupation as the president and owner of a construction company in various ways. On his Equitable application, Helus wrote that his current duties were: "Supervisory only—no manual duties. Marketing only. Firm has 20 employees." Def.'s Exh. 1. When Helus submitted his first claim for benefits in December 1992, he described his duties as "running all operations and projects" for "50+" hours a week. Def.'s Exh. 2, at 2. Five years later, Equitable asked Helus to identify his occupational duties and list them in order of importance. Helus described the following four duties in this order:

(1) Office Manager & President, 25 hours per week
Oversaw 35 employee's [sic] in accounting, sales bidding, secretary staff & project managers.

(2) President, Sale, 10 hours per week
Set up meetings with proposed clients for new projects, sat with architect, owners and city inspectors.

(3) President Project Manager, 10 hours per week
Went to job sites to view work completion, progress of jobs, walk jobs with owners and inspectors.

(4) President/Bidding, 5 hours per week
Work with arch. [sic] & owners on valued engineering or jobs to bring in new ideas to saving money, time but still have a functional building.

Def.'s Exh. 5, at 1. Helus also expanded on this description at his deposition.[8]

---

8. Helus described his duties as follows:

I developed the company, I hired—hired staff, I fired staff, I evaluated staff, I went

Equitable argues that Helus performed many of the above duties when he was working in the construction industry. For example, as a construction manager for T.D. Service Financial Corporation in 1994 and 1995, Helus inspected construction sites and supervised as many as 300 subcontractors working on a five-story building. Def.'s Exh. 6, at 285:8–15; Def.'s Exh. 10, at 4. As a project manager with Reno Construction from August to October 2000, Helus supervised the project superintendent, negotiated with subcontractors, and helped lower costs through valued engineering. Def.'s Exh. 7, at 32:17–24, 34:21–23 & 35:8–14. And as a full-time quality control manager for Frontier Contracting between November 2000 and April 2001, Helus conducted safety inspections at the work site, supervised other employees and acted as a liaison between Frontier and the overseeing construction management firm. Def.'s Exh. 15, at 19:7–16 & 29:14–23.[9]

Helus maintains that his unsuccessful experience with these positions shows he cannot return to the duties of his occupation. Lee Greytak, his supervisor at T.D. Services Financial Corporation, stated Helus "was under quite a bit of stress" and opined that this stress would affect his abilities as an owner and manager of a construction company. Pl.'s Exh. Q, at 46:3–6. While Helus was at Reno Construction, his supervisor reported that "the office people had some frictions [sic] with him" such as "pushing paperwork on people and being abrupt and trying to get people to do things instead of waiting his turn with things." Pl.'s Exh. R, at 57:12–13 & 15–17. Helus suddenly left after three months because he believed the supervisor was "micromanaging the project" and "second-guessing" his work. Pl.'s Exh. S, at 214:16 & 224:22. Finally, Art Vollert, the owner of Frontier Contracting, said Helus's communication style was "very direct, not really a cordial approach," and Helus "would lose his temper out on the jobsite." Pl.'s Exh. T, at 46:9–10 & 64:21. Vollert found Helus's communication and documentation abilities below what he expected from a past owner of a construction company. Id. at 64:1–11. When Vollert refused to give Helus a raise to pay for car expenses, Helus abruptly quit. Id. at 49:2–22.

Equitable also relies on two psychiatric evaluations of Helus conducted by Dr. William Lynch and Dr. James Missett in No-

out and seeked [sic] clients for projects. I did all the estimating, I reviewed all the estimating, I did all the budgeting, I ran and supervised all the projects, supervised my project managers, superintendents, staff.

I procured office equipment, office materials, office furniture, office spaces, tried to develop other companies, tried to create growth for the company. I did all the communications, all the negotiations, and I took all the responsibility on my shoulders for any failures or any profits we made....

I did valued engineering, I read plans, reviewed plans ... whatever it takes to run a construction company was my duty: Hiring attorneys, hiring and going to banks, getting credit lines at the banks, getting bonding, representing Helus Construction as the owner and president....

Promoting Helus construction, going to seminars, promoting, donating money and stuff from the corporation to different—what do they say, project—when we go to, like there's different networking, taking clients out to dinner, those types of things. We did a lot of that, trying to get projects. Def.'s Exh. 6, at 148:4–15, 148:18–23 & 148:25–149:5.

9. Equitable also mentions Helus's law enforcement positions, but fails to explain how his work with SBSD and COFD shows that he can perform the substantial and material duties of his occupation. At most, the work with SBSD indicates Helus could supervise and train others in the context of law enforcement.

vember 2001. After reviewing Helus's medical and employment records and administering several diagnostic tests, Dr. Lynch found that Helus suffered from a "mild dysphoria—along with mild anxiety" at a level that "is not contraindicative of employment." Def.'s Exh. 31, at 20. Dr. Missett also reviewed Helus's records and conducted an interview with Helus. On the basis of this information, as well as the tests administered by Dr. Lynch, Dr. Missett concluded that Helus "is not currently suffering any kind of psychiatrically based disability to work as the owner and/or general manager of a large construction company." Def.'s Exh. 30, at 31.

In turn, Helus relies on Dr. Keram's July 2000 IME report and a psychiatric evaluation by Dr. Jerry Howle conducted in May 2001.[10] Dr. Keram agreed with Helus and his treating therapist that Helus would not "successfully resume work in the construction field," although she believed he would "eventually successfully return to some type of gainful employment." Def.'s Exh. 21, at 12. Dr. Howle, who interviewed Helus and reviewed his treatment records, concluded that Helus "because of his psychiatric condition, is presently unable to perform the duties of an owner/manager of a construction company." Pl.'s Exh. O, at 5.

Neither Helus nor Equitable have addressed which duties should be considered substantial and material to Helus's occupation. Equitable seems to assume that all of the duties Helus listed in 1997 on the occupational duties form are substantial and material; however, the form only asks for "the duties of your occupation in order of their importance." Def.'s Exh. 5, at 1. Helus contends that he is unable to act in a managerial capacity with financial obli-

gations, which includes all of the substantial and material duties of a construction company owner. In *McOsker v. Paul Revere Life Insurance Co.*, 279 F.3d 586 (8th Cir.2002), the former president of a business claimed he could not engage in the important duties of his occupation because he was unable to take responsibility for others after having "run a company into the ground." *Id.* at 589. The claimant's doctor opined that he "could return to work but not at pre-disability level of functioning," which the court interpreted to mean that the plaintiff could work in some capacity but not in a managerial position. *Id.* at 588. "It was, in other words, duties that carried significant consequences for others that [claimant] was unable to perform … and all of [claimant's] duties were of that variety." *Id.* at 589.

At his deposition, Helus explained that he felt he could not take on responsibilities similar to those he had as owner of Helus Construction because of the "stress and depression it puts me in." Def.'s Exh. 6, at 189:16–24. When he worked on the project budget for Reno Construction, Helus said he "couldn't adequately do what I wanted to do because of the limitations that I had been under for so long a time …. I tried to do it to the best of my ability, feeling the pressures and the depression that I was in and not letting it out to others to see, because I knew that I had—I had to do something. And not to be is failure feeling as I was [sic]." *Id.* at 194:2–9. Although Helus could not remember someone specifically telling him there were problems with his work, he felt that he performed inadequately. *Id.* at 194:18–24.

10. Helus also relies on the deposition of Taira St. John, who was Helus's therapist in 2001. While St. John stated that Helus had "generalized anxiety" and depression, she did not opine whether Helus could engage in his occupational duties. Def.'s Exh. N, at 37:17–18, 66:3.

Both Dr. Keram and Dr. Howle have concluded that Helus's psychiatric symptoms limit his occupational functioning. Dr. Keram found that Helus's "level of anger, irritability and frustration intolerance" put him "at a significant risk for re-development of a major depressive episode if he were forced to return to the workplace at the current time." Def.'s Exh. 21, at 11. Dr. Keram also noted that Helus's personality traits "render him vulnerable to developing serious psychiatric symptoms when faced with anxiety provoking situations in which he might experience failure or loss of control." *Id.* Dr. Howle found Helus's symptoms are "most consistent with Post Traumatic Stress Disorder.... [T]he loss of his business is the kind of experience which would exacerbate an underlying, chronic, Post Traumatic Stress Disorder. This would explain why it is particularly difficult for him to consider returning to a similar type of employment situation." Pl.'s Exh. O, at 5.

Equitable contends that Dr. Keram's and Dr. Howle's conclusions indicate nothing more than a speculative risk of relapse if Helus performs his occupational duties, not an actual determination that Helus's psychiatric symptoms prevent him from engaging in his duties. The court finds the distinction without a difference in this context. Unlike the California cases cited by Equitable, where fear of prospective disability was deemed not compensable by disability retirement, Helus has offered medical opinions saying he is currently limited by chronic psychiatric symptoms. That these symptoms may be exacerbated by his occupational duties is clearly relevant to whether he can engage in the substantial and material duties of his occupation. *See, e.g., Wolfman v. Bd. of Trustees,* 148 Cal.App.3d 787, 196 Cal.Rptr. 395 (1983) (finding public school teacher with chronic asthma disabled from her usual and customary duties where her condition

would worsen if she were exposed to dust and infectious agents at school).

Equitable also points out that neither Dr. Keram nor Dr. Howle knew Helus's full employment history. In her deposition, Dr. Keram testified that Helus informed her "he had not worked for any monetary compensation since the early 1990s, in any capacity." Def.'s Exh. 25, at 73:12–14. When asked whether she would reconsider her "diagnoses regarding his [Helus's] impairment level" if she knew Helus's work history and the fact that he began working as a project manager for Reno Construction a month after she interviewed him, Dr. Keram agreed she would. She did not explain, however, what the new diagnosis would be. Dr. Keram also clarified at the deposition that she believed "it probably wouldn't be a good idea for him [Helus] to run his own construction company because of his vulnerabilities. I think he certainly could do some type of work within the construction field. It's a very broad field." Pl.'s Exh. F, at 50:13–17. Dr. Keram's testimony does cast doubt on the conclusions in her report. But taking all inferences in favor of Helus, as this court is required to do in a motion for summary judgment, it appears Dr. Keram still believes Helus is limited by his psychiatric symptoms from performing duties of managerial positions.

Dr. Howle's report does not list any of Helus's employment records or discuss Helus's jobs in the construction industry. Pl.'s Exh. O. In fact, Dr. Howle states in his report that Helus "has been involved in no construction project since 1990." *Id.* at 3. While Dr. Howle agreed at his deposition that considering all work-related activities was relevant to evaluating whether someone had a disability, he said he "probably did not" do so because he "attempted to limit this effort at this stage." Pl.'s Exh. Y, at 81:20–82:3. Further informa-

tion would not have changed his conclusion that Helus "may be overstating his symptoms, but that he is not making them up," a conclusion he believed was consistent with Dr. Missett's and Dr. Lynch's reports. *Id.* at 82:5–14. Again, taking all inferences in favor of Helus, Dr. Howle appears not to have changed his conclusion concerning the impact of Helus's symptoms on his occupational abilities.

Therefore, this court finds there are disputed issues of material fact as to whether Helus could engage in the substantial and material duties of his occupation when Equitable ceased making disability payments in June 2001. Both Equitable and Helus have offered medical experts with contradictory opinions whose credibility should be assessed by a jury. *United States v. Schmidt,* 572 F.2d 206, 208 (9th Cir.1978) (jury should resolve conflicting psychiatric testimony). In addition, Helus has set forth specific facts about his positions with T.D. Service Financial Corporation, Reno Construction and Frontier Contracting that could lead a reasonable jury to conclude he could not meaningfully engage in his occupational duties when Equitable stopped its payments.[11] Ultimately, the jury will have to weigh the evidence before it, including whether Helus's testimony about his symptoms is credible, to determine whether Equitable breached its contract with Helus.[12]

## III. *Breach of Covenant of Good Faith and Fair Dealing*

Every insurance contract implies a covenant of good faith and fair dealing. *Frommoethelydo v. Fire Ins. Exchange,* 42 Cal.3d 208, 214, 228 Cal.Rptr. 160, 721 P.2d 41 (1986). "The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits." *Love v. Fire Ins. Exch.,* 221 Cal.App.3d 1136, 1151, 271 Cal.Rptr. 246 (1990). The covenant of good faith and fair dealing is supplemental to the contractual provisions. *Id.* at 1153, 271 Cal. Rptr. 246. "Thus, when benefits are due an insured, delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because it frustrates the insured's primary right to receive the benefits of his contract—i.e., prompt compensation for losses." *Id.; see also Waller v. Truck Ins. Exch., Inc.,* 11 Cal.4th 1, 36, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995) (quoting *Love* ).

The requirements of a bad faith action include: "(1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause." *Love,* 221 Cal.App.3d at

---

**11.** Unlike some types of physical disabilities, where a person can be deemed "cured" at a certain point in time, persons suffering mental illness may experience progress and then suffer a relapse. In reviewing denial of Social Security benefits for someone with mental illness, a court in this district explained: " 'Symptom-free intervals, though sometimes indicative of a remission in the mental disorder, are generally of uncertain duration and marked by an impending possibility of relapse. Realistically, a person with a mental impairment may be unable to engage in competitive employment, as his ability to work may be sporadically interrupted by unforeseeable mental setbacks.' " *Lebus v. Harris,* 526 F.Supp. 56 (N.D.Cal.1981) (Williams J.). As such, this court is loath to grant summary judgment based on past work duties, particularly when the policy itself provides benefits for recurrent periods of total disability.

**12.** The court has its doubts about whether Helus will ultimately win on the merits; however, given that there is a genuine dispute as to material facts, it is the jury that must make the final determination here.

1151, 271 Cal.Rptr. 246. A biased investigation may constitute unreasonable conduct sufficient to find bad faith. *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 819, 169 Cal.Rptr. 691, 620 P.2d 141 (1979). Even where benefits are due, summary judgment against the insured on a bad faith claim may be appropriate if the insurer's conduct was reasonable. *Franceschi v. American Motorists Ins. Co.*, 852 F.2d 1217, 1220 (9th Cir.1988). A court can find as a matter of law that the insurer acted reasonably in denying benefits if there was a genuine dispute about coverage, whether the dispute is factual or legal. *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992–94 (9th Cir.2001). The reasonableness inquiry focuses on what the insurer knew at the time of denial. *Austero v. National Cas. Co.*, 84 Cal.App.3d 1, 32, 148 Cal.Rptr. 653 (1978), *overruled on other grounds by Egan*, 24 Cal.3d at 824 n. 7, 169 Cal.Rptr. 691, 620 P.2d 141.

▮▮▮ Helus claims that Equitable acted in bad faith by allegedly misrepresenting Dr. Keram's IME report in its October 25, 2000 letter to Helus so that Helus would not dispute the termination of his benefits. In its letter, Equitable stated that "we have two independent medical evaluations that were performed and each of them indicated that you are not currently disabled" and offered Helus eight more months of benefits as a "service" to him. Def.'s Exh. 25, at 1. Equitable also gave Helus the choice of the benefit payments in a lump sum or monthly installments, but "in either event your claim will be considered closed." *Id.* In addition, Helus alleges that Equitable acted in bad faith by

refusing to give copies of the IME reports to Helus. Equitable later paid Helus one more month of benefits "as a gesture of goodwill." Def.'s Exh. 28, at 1. In June 2001, Equitable wrote Helus a final letter in which it reviewed his claim and terminated his benefits. Def.'s Exh. 29, at 1.

The court has some doubts as to whether Helus has stated a bad faith claim, given that Equitable continued paying Helus for nine more months after it allegedly misrepresented Dr. Keram's conclusion in its October 25, 2000 letter. In *Love*, the court stated in dicta that "plaintiff must show, at a minimum, benefits were delayed or withheld" to show bad faith.[13] *Love*, 221 Cal.App.3d at 1151 n. 10, 271 Cal.Rptr. 246. Even if Equitable's letter were construed as a settlement offer, no benefits due Helus were delayed or withheld as a result of the alleged misrepresentation.

Helus appears to argue in the alternative that the alleged misrepresentation impaired his rights with respect to Equitable's final decision to terminate his benefits in June 2001. Helus relies on *Schwartz v. State Farm Fire and Cas. Co.*, 88 Cal.App.4th 1329, 106 Cal.Rptr.2d 523 (2001), to argue that bad faith may rest on impairment of future benefits as long as there is the potential for coverage. *Schwartz* concerned the impact of an excess insurer's actions on an insured who had not yet been awarded benefits for his claim. The court held that an insurer could be sued for bad faith even if coverage had not yet attached as long as its actions negatively affected the insured's

---

**13.** The court quoted the following language from the 1989 version of the California Practice Guide: "Where benefits are fully and promptly paid, no action lies for breach of the implied covenant—no matter how hostile or egregious the insurer's conduct toward the insured may have been prior to such payment. I.e., absent an actual withholding of benefits due, there is no breach of contract and likewise no breach of the insurer's implied covenant." Kornblum et al., Cal. Practice Guide: Bad Faith (TRG 1989) § 4:28 at 4–9. *See also* Croskey et al., Cal. Practice Guide: Insurance Litigation (2002) § 12:813 at 12C–5 (same language).

future benefits. *Id.* at 1335, 106 Cal. Rptr.2d 523.

Helus has failed, however, to put forth specific facts showing how the alleged misrepresentation impaired his contractual rights.[14] In November 2000, Equitable sent the IME reports to Helus's attorney and his current treatment provider. Def.'s Reply Pl.'s Suppl. Opp'n Mot. Summ. J., Exh. D at 1–2. Helus could have submitted additional materials to Equitable but did not. Moreover, by June the administration of Helus's claim had been transferred to Disability Management Services. John LaBroad, who was responsible for the decision to terminate Helus's benefits, stated that he "made a decision of my own" and that his evaluation was "based upon all the information in the claim file several months following UnumProvident's decision." *Id.*, Exh. B, at 132:17–18, 133:2–4. He specifically denied "going along with their decision;" "I could have done differently [sic] if I found the basis that supported disability, but I did not." *Id.* at 133:5–8. Taking all inferences in favor of Helus, no reasonable jury could conclude that the alleged misrepresentation impaired Helus's contractual rights. Therefore, the court grants summary judgment on this claim.

## V. *Punitive Damages*

Without a bad faith claim, there can be no punitive damages. Therefore, the court also grants summary judgment on the request for punitive damages.

## CONCLUSION

In accordance with the foregoing, IT IS HEREBY ORDERED that defendant's motion to dismiss is GRANTED, defendant's motion to strike is GRANTED, and defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

---

**14.** In his deposition, Helus explained that he did not tell Equitable about his job with Reno Construction because "of the fear that they were going to drop me." Def.'s Exh. 6, at 308:17 & 309:24–25. But Helus also said that he may not have advised Equitable about his work with T.D. Financial Services, which occurred before the alleged misrepresentation, for the same reason: "I would be losing my disability, that I was trying to make ends meet." *Id.* at 289:25–290:1.