**Alan M. GROSS, M.D., Plaintiff,**

v.

**UNUMPROVIDENT LIFE INSURANCE COMPANY, The Paul Revere Life Insurance Company, and Does 1 through 100, Inclusive, Defendants.**

No. CV 03–4335–SVW (PJWx).

United States District Court,
C.D. California.

May 18, 2004.

8. Docket number 64.

1130

Alice J. Wolfson, Alan M. Gross, Ray F. Bourhis, David M. Lilienstein, Bourhis & Wolfson, San Francisco, CA, Allen R. Ball, Ball & Yorke, Ventura, CA, for plaintiff.

Thomas B. Ackland, Andrew S. Williams, Barger & Wolen, Los Angeles, CA, for defendants.

AMENDED ORDER DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING TOTAL DISABILITY ISSUE IN PLAINTIFF'S BREACH OF CONTRACT CLAIM AND TOTAL AND RESIDUAL DISABILITY ISSUES IN DEFENDANTS' COUNTERCLAIM.

WILSON, District Judge.

## I. INTRODUCTION/FACTUAL & PROCEDURAL BACKGROUND

Dr. Gross is an orthopedic surgeon. He became permanently disabled when, as a result of diabetes, he developed numbness in his hands and feet as well as problems with his eyes, all of which led to his ceasing to perform surgery on December 17, 2001. On February 7, 2002, Dr. Gross filed a request for total disability benefits under two policies with Paul Revere, a disability income policy and a business overhead expense policy. After being asked to provide a great deal of evidence, he was denied benefits under his policies on January 16, 2003 because Defendants determined that he did not fit within the definitions of "totally disabled" in his two policies. The primary question in this action is whether Dr. Gross is entitled to coverage for total disability under the policies issued by Paul Revere Life Insurance Company ("Paul Revere"). A secondary question is whether Dr. Gross is entitled to residual disability benefits, which he was denied because he allegedly does not fit within the income loss requirements of the policy's residual disability clause.

On October 3, 2003, Defendants filed a Motion for Partial Summary Judgment. On November 12, 2003, the Court issued an order granting in part and denying in part Defendants' Motion ("November 12 Order"). Namely, the Court granted the Motion insofar as it sought a definition of total disability, which the Court defined for purposes of this case as Plaintiff's inability to perform all the important duties of his occupation. The Court denied the Motion insofar as it sought an adjudication that Plaintiff is not totally disabled. The parties were in disagreement as to Plaintiff's ability to perform the non-surgical important duties of his occupation post-disability; as to whether Plaintiff timely notified Defendants of his inability to perform these duties; and as to what duties ought to be included within the scope of "important duties." Thus, the Court at that time was unable to reach a determination regarding whether or not Dr. Gross met its definition of totally disabled. As a result, the Court postponed the trial date to give the parties an opportunity to further develop those factual issues.

On January 26, 2004, Defendants filed a second Motion for Partial Summary Judgment Regarding Total Disability Issue in Plaintiff's Breach of Contract Claim and Total and Residual Disability Issues in Defendants' Counterclaim. For the reasons set forth below, that Motion is now DENIED. Defendants have not met their summary judgment burden with respect to the total disability issue; furthermore, the

Court declines to decide the residual disability issue until the total disability question has been resolved.

## II. LEGAL STANDARD—SUMMARY JUDGMENT

Rule 56(c) requires summary judgment for the defendants, as the moving party, when the evidence, viewed in the light most favorable to the plaintiffs, shows that there is no genuine issue as to any material fact. *See* Fed.R.Civ.P. Rule 56(c); *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir.1997). The defendants bear the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). That burden may be met by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548.

Once the defendants have met their initial burden, Rule 56(e) requires the plaintiff to go beyond the pleadings and identify facts that show a genuine issue for trial. *See id.* at 323–34, 106 S.Ct. 2548; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. DISCUSSION—TOTAL DISABILITY

Paul Revere issued a disability income protection policy to Plaintiff on April 3, 1989. That policy defines total disability as follows:

"Total Disability" means that because of Injury or Sickness:

 a. You are unable to perform the important duties of your occupation; and

 b. You are under the regular and personal care of a Physician.

(Berube Decl., Exh. A, at 23.)

### A. Definition of Total Disability

Plaintiff's disability policy is an "own occupation" policy, also known as an occupational policy. "Occupational policies indemnify the insured when he becomes disabled from performing the material acts necessary to his chosen profession, whereas, general disability policies indemnify the insured only when he becomes incapable of following any occupation for profit." *Yahiro v. Northwestern Mut. Life Ins. Co.*, 168 F.Supp.2d 511, 515 (D.Md.2001).

Regarding the task of discerning the precise meaning of total disability in this insurance policy, the decades-old words of Justice Tobriner ring particularly true:

> On countless occasions we have inveighed against the careless draftsmanship of documents of insurance and have decried the evil social consequences that flow from lack of clarity. We have emphasized that the uncertain clause leaves in its murky wake not only the disillusioned insured and the protesting insurer but also the anguished court.

*Bareno v. Employers Life Ins. Co. of Wausau*, 7 Cal.3d 875, 878, 103 Cal.Rptr. 865, 500 P.2d 889 (1972) (internal citations omitted).

Plaintiff urges the Court to adopt the definition of total disability set forth by the California Supreme Court in *Erreca v. Western States Life Ins. Co.*, 19 Cal.2d 388, 121 P.2d 689 (1942): "such a disability as renders the insured unable to perform the substantial and material acts necessary to the prosecution of a business or occupation in the usual or customary way." *Id.* at 396, 121 P.2d 689. "[A]bsolute helplessness" is not required; thus, an insured's ability "to perform sporadic tasks, or give attention to simple or inconsequential de-

tails incident to the conduct of business" does not preclude recovery. *Id.* "Conversely, the insured is not totally disabled if he is physically and mentally capable of performing a substantial portion of the work connected with his employment. He is not entitled to benefits because he is rendered unable to transact one or more of the duties incidental to his business." *Id.*

The *Erreca* court held that the insured, a farmer, was totally disabled because he was unable to perform manual labor of any kind or to supervise and manage farm operations. *Id.* at 396–97, 121 P.2d 689. The insured did remain able to negotiate loans and leases, sign notes and mortgages, talk with grain buyers, participate in buying supplies, and talk with his son concerning farm operations, but the court found that "[a]lthough such activities are neither trivial nor inconsequential, they are the type of duties that are infrequently and intermittently performed and cannot be said to constitute the substantial and material acts of the occupation of farming." *Id.* at 397, 121 P.2d 689.

It is true that *Erreca* involved an "any occupation" policy, not an "own occupation" policy. *Erreca,* 19 Cal.2d at 390, 121 P.2d 689. That factual difference does render some of the holdings in *Erreca* inapplicable to this case, or to any case involving an own occupation policy. For instance, the court defined total disability for purposes of an any occupation policy as "a disability which prevents [the insured's] working with reasonable continuity in his customary occupation or in any other occupation in which he might reasonably be expected to engage in view of his station and physical and mental capacity." *Id.* at 394–95, 121 P.2d 689 (quoting *Hurwit v. Prudential Ins. Co. of America,* 45 Cal. App.2d 74, 81, 113 P.2d 691); *accord Moore v. American United Life Ins. Co.,* 150 Cal.App.3d 610, 618, 197 Cal.Rptr. 878 (1984). It should not, however, affect the

applicability to a case involving an own occupation policy of *Erreca's* more general definition of total disability to perform a given occupation. *See Austero v. Nat'l Casualty Co. of Detroit, Michigan,* 84 Cal. App.3d 1, 20, 148 Cal.Rptr. 653 (1978) ("We see no reason for distinguishing between nonoccupational and occupational disability policies in terms of the definition of 'total disability' ...."); *id.* at 22, 148 Cal.Rptr. 653 ("it is clear that the California courts oppose strict adherence to a highly limited definition of 'total disability' in both nonoccupational and general occupational disability policies"). *See also Bareno,* 7 Cal.3d at 886–87, 103 Cal.Rptr. 865, 500 P.2d 889 (applying *Erreca's* definition of total disability without specifying whether the policy was an own occupation or an any occupation policy).

The policy at issue in *Austero* defined total disability as the insured's inability to perform "any and every duty pertaining to his profession or occupation." 84 Cal. App.3d at 5, 148 Cal.Rptr. 653. Notwithstanding the apparent strictness of this definition, the appellate court upheld a jury instruction that the plaintiff was totally disabled if he was "rendered unable to perform the substantial and material duties of his occupation in the usual and customary way." *Id.* at 19, 148 Cal.Rptr. 653. The court resisted a literal instruction based on the precise wording of the policy. "Certainly, it would be far beyond the reasonable expectations of an attorney covered by a disability policy, to discover, for instance, if he were still able to return a client's telephone call or Shepardize a case but do nothing else, that he would not be considered totally disabled." *Id.* at 22, 148 Cal.Rptr. 653.

The Court upheld the jury verdict that the plaintiff, an attorney, was totally disabled even though there was evidence that, for example, in one year for which he

claimed total disability "he appeared at 251 hearings [and] had 689 appointments with clients." *Id.* at 23, 148 Cal.Rptr. 653. Because there was a sharp conflict in the evidence as to whether the plaintiff was totally disabled, the court declined to disturb the jury verdict. *Id.*

■ The courts' expansive reading of the total disability language is consistent with the general principle of reading ambiguities in insurance policies against the insurer. "We think that the responsibility for writing clear and simple policies lies with the insurance industry, and that the tremendous growth of insurance in this country enhances the need for such policies." *Bareno,* 7 Cal.3d at 878, 103 Cal. Rptr. 865, 500 P.2d 889. "These considerations of public policy have long led courts to insist that insurers draw clear policies or suffer adverse consequences; we have consistently held that ambiguities in such documents must be resolved against the insurer." *Id.* (citing, inter alia, *Gray v. Zurich Ins. Co.,* 65 Cal.2d .263, 269, 54 Cal.Rptr. 104, 419 P.2d 168 (1966)); *accord,* Cal. Civ.Code § 1654 ("In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.").

■ Defendants argue that total disability has a different definition where, as here, the insurance policy contains a residual (or partial) disability clause in addition to a total disability clause. The policy defines residual disability as follows:

"Residual Disability", prior to the Commencement Date, means that due to Injury or Sickness:

a. (1) You are unable to perform one or more of the important duties of Your Occupation; or

(2) You are unable to perform the important duties of Your Occupation for more than 80% of the time normally required to perform them; and

b. Your Loss of Earnings is equal to at least 20% of Your Prior Earnings while You are engaged in Your Occupation or another occupation; and

c. You are under the regular and personal care of a physician.

(Berube Decl., Exh. A, at 23.)

A 1935 California Supreme Court case considered the interplay between a total disability clause and a partial disability clause. *Dietlin v. General Am. Life Ins. Co.,* 4 Cal.2d 336, 49 P.2d 590 (1935). The *Dietlin* court adopted verbatim the opinion of the Court of Appeal. *Id.* at 338, 49 P.2d 590. The insurance policy at issue in that case defined total disability as inability to perform "any and every kind of duty pertaining to [insured's] occupation" and partial disability as the inability to perform "one or more important daily duties pertaining to his occupation." *Id.* at 341, 49 P.2d 590. The insured, a plastering contractor, claimed total disability as a result of his inability following an accident to climb ladders and scaffolds, a required part of his job. *Id.* at 345, 49 P.2d 590. The court held that the plaintiff was not totally disabled where he was able to perform his other duties. Unlike in the case at bar, the policy in *Dietlin* plainly defined total disability as the inability to perform all the duties of the insured's occupation. Nonetheless, the insured argued against a literal interpretation of the policy language. "Appellant complains that the trial court applied a literal construction to the words 'total disability'. [sic] We fail to see how the term could have been construed otherwise. He is not totally disabled unless he is prevented from performing 'any and every kind of duty pertaining to his occupation'. [sic] If he is disabled only to the extent of being unable to 'perform one or more important daily duties', [sic] he is within the definition of the term 'partial disability.' " *Id.*

The *Dietlin* court attempted to reconcile its holding with the precedents holding that total disability need not mean absolute helplessness. "There is no contention that it is necessary that appellant be helpless and unable to perform any of his daily duties, to constitute total disability." *Id.* at 345, 49 P.2d 590. But in the very next sentence, the court restated its holding that anything less than inability to perform each and every occupational duty would constitute partial disability, not total disability. "However, where he is disabled only from performing one or more of those duties, and is able to perform others, he is only partially disabled." *Id.* It is hard to imagine how, under this definition, one who was anything but absolutely helpless, at least with respect to performing the duties of his own occupation, could be found to be totally disabled.

In distinguishing *Erreca* from *Dietlin,* the California Supreme Court did not discuss the definition used by the *Dietlin* court. Instead, the *Erreca* court distinguished *Dietlin* on its facts, stating that, "In denying recovery of benefits for total disability, the [*Dietlin*] court reasoned that the climbing of scaffolds did not constitute a substantial portion of his duties. Unlike respondent, he was still able to perform the managerial and supervisorial activities connected with his business." *Erreca,* 19 Cal.2d at 398, 121 P.2d 689. Thus, the *Erreca* court essentially found that Dietlin would have failed to prove total disability even under the "substantial and material duties" standard because the one duty Dietlin was unable to do—climbing scaffolds—did not represent a substantial portion of his duties.

Similarly, the *Austero* court, while noting that "the terms of the policy [which used the same any and every duty language to define total disability as was used in the *Austero* policy] were seemingly adhered to" in *Dietlin,* distinguished *Dietlin* on its facts.

Here, plaintiff claims that he was unable to perform *all* the substantial and material duties of his profession; thus, he was totally disabled. He did not contend that he was totally disabled because he was unable to perform *a* substantial and material duty. *Dietlin* specifically addressed the former situation in stating that 'after ability of the plaintiff to perform certain substantial portions of his daily duties had been admitted by plaintiff, proof that he could not perform certain other important portions of those duties was not relevant.'

*Austero,* 84 Cal.App.3d at 21, 148 Cal.Rptr. 653 (quoting *Dietlin,* 4 Cal.2d at 346, 49 P.2d 590). It is unclear whether the *Austero* court was saying that the plaintiff there would have satisfied even the stringent test adhered to by the *Dietlin* court, or that Dietlin would have failed to show total disability even under the more permissive and non-literal test espoused by the *Austero* court.

Defendants also rely on *Dym v. Provident Life & Accident Ins. Co.,* 19 F.Supp.2d 1147 (S.D.Cal.1998). Dr. Dym was a board certified gynecologist who was injured in an automobile accident. *Id.* at 1148. Like Dr. Gross, Dr. Dym held an own occupation disability income insurance policy. *Id.* The policy defined total disability as:

1. you are not able to perform the substantial and material duties of your occupation; and

2. you are receiving care by a Physician which is appropriate for the condition causing the disability.

*Id.* The policy further defined "your occupation" as "the occupation (or occupations, if more than one) in which you are regularly engaged at the time you become disabled. If your occupation is limited to a

recognized specialty within the scope of your degree and license, we will deem your specialty to be your occupation." *Id.*

Dr. Dym claimed that he was totally disabled because, after his accident, he was unable to perform most of the surgeries he had performed prior to the accident. When he was denied total disability coverage, he sued Provident, his insurance company. Provident moved for summary judgment on the interpretation of the total disability provision. *Id.* at 1149. The court held that Dr. Dym was not permanently disabled because he was still able to perform one of the substantial and material duties of his occupation—performing minor surgery in the form of first trimester abortions. *Id.* at 1149. The court determined that total disability means inability to perform *any* of the substantial and material duties of the insured's occupation. *Id.* at 1149–50. This conclusion was compelled by the interplay between the policy's total disability and residual disability clauses. The policy provided that "Residual disability or residually disabled, during the Elimination Period, means that due to Injuries or Sickness:"

1. you are not able to do *one or more* of your substantial and material daily business duties or you are not able to do your usual daily business duties for as much time as it would normally take you to do them;

2. you have a Loss of Monthly Income in your occupation of at least 20%; and

3. you are receiving care by a Physician which is appropriate for the condition causing disability.

*Id.* (emphasis added in *Dym*). "A comparison of the two definitions suggests that the phrase 'you are not able to perform the substantial and material duties of your occupation' as used in the 'total disability' definition cannot reasonably be read as 'you are not able to perform one or more

of the substantial and material duties of your occupation,' because if such a reading was intended, the language 'one or more' would have been used, as it is in the 'residual disability' definition." *Id.* at 1150.

The Court finds this reasoning unpersuasive. If the insurer meant, in the total disability provision, to say "all," the insurer easily could have done so. Thus, that the insurer did not write "one or more" in the total disability clause does not compel the conclusion that the total disability provision impliedly includes the word "all." Furthermore, it is possible to apply California's standard total disability definition without reading "one or more" into the total disability provision. The *Dym* court did not at any time consider *Erreca* or any of the other California total disability precedents. There must be a point at which an insured passes over from partial disability to total disability, a point that may be short of being disabled from performing *all* the substantial and material duties of her profession. Along these lines, it is worth noting that, even under the *Dym* court's construction of the total disability provision there would be some overlap between total disability and residual disability, as one who is unable to perform all the substantial and material duties of her occupation is, by definition, unable to perform one or more of those substantial and material duties.

The opinion gives no indication that Dr. Dym raised these objections. Instead, Dr. Dym protested that he had been insured as a board certified gynecologist, but that post-disability he was only able to perform first trimester abortions, which non-gynecologists could do as well. *Id.* The court rejected this argument. First, the court noted repeatedly that Dr. Dym's expectations were irrelevant because reasonable expectations arguments are considered

only when the policy language is ambiguous. *Id.* at 1150 & n. 2 (citing *AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 822, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990); *Republic Indem. Co. v. Superior Court,* 224 Cal.App.3d 492, 504, 273 Cal.Rptr. 331 (1990)). The court found that the language of the total disability provision was unambiguous "when read in the context of the entire policy." *Id.* at 1150. Again, the court did not consider California's total disability precedents. In addition, the court found that Dr. Dym would fail to show total disability even if his reasonable expectations were considered. Dr. Dym presented no evidence that doctors other than gynecologists performed first trimester abortions. *Id.* Moreover, Dr. Dym could still perform first trimester abortions, to which he had devoted approximately half of his time prior to the accident. *Id.* In addition, Dr. Dym admitted that performing first trimester abortions constituted performing minor surgery, and he had previously said that minor surgery was one of the important duties he performed prior to the accident. *Id.* "[P]laintiff cannot reasonably argue that he is not getting the protection he was promised under the policy where he can continue to perform what he himself admitted is an 'important duty' of a gynecological surgeon, a duty to which he previously devoted a substantial portion of his practice." *Id.*

The U.S. District Court for the District of Maryland reached the same conclusion in *Yahiro v. Northwestern Mut. Life Ins. Co.,* 168 F.Supp.2d 511 (D.Md.2001). Dr. Yahiro was a board certified orthopedic surgeon who, as a result of suffering from "repeated and debilitating episodes of lightheadedness, diaphoresis, nausea, and vomiting," discontinued performing surgery. *Id.* at 512. Northwestern paid Dr. Yahiro partial disability, but he filed an action seeking total disability. *Id.* Dr. Yahiro had three policies with Northwestern.

The first two had the following relevant definitions:

> **Total Disability....** [T]he Insured is totally disabled when he is unable to perform the principal duties of his occupation.
>
> **Partial Disability.** The Insured is partially disabled when:
>
> a. he is unable:
>
> — to perform one or more of the principal duties of his occupation; or
>
> — to spend as much time at his occupation as he did before the disability started; and
>
> b. He has at least a 20% Loss of Earned Income.
>
> **Occupation.** The words "his occupation" mean the occupation of the Insured at the time he becomes disabled. If the Insured is regularly engaged in more than one occupation, all of the occupations of the insured at the time he becomes disabled will be combined together to be "his occupation."

*Id.* at 513. The third policy had similar, but slightly different terms:

> **Total Disability....** [T]he insured is totally disabled when he is unable to perform the principal duties of his occupation.
>
> If the Insured can perform one or more of the principal duties of the regular occupation, the Insured is not totally disabled; however, the Insured may qualify as partially disabled.
>
> **Partial Disability.** The Insured is partially disabled when:
>
> a. The Insured is unable:
>
> — to perform one or more but not all of the principal duties of the regular occupation; or
>
> — to spend as much time at the regular occupation as before the disability started; and

b. the Insured has at least a 20% Loss of Earned Income; and

c. The Insured is gainfully employed in an occupation.

**Regular Occupation.** The words "regular occupation" mean the occupation of the Insured at the time the Insured becomes disabled. If the Insured is regularly engaged in more than one occupation, all of the occupations of the Insured at the time the disability starts will be combined together to be "the regular occupation."

*Id.* at 513–14. Dr. Yahiro argued that the terms "occupation" and "principal duties" should be given their layperson meanings and that, because the layperson would agree that an orthopedic surgeon's principal duty was to do surgery, his inability to perform surgery rendered him totally disabled. *Id.* at 514. Northwestern, on the other hand, argued that surgery is not an orthopedic surgeon's only principal duty; therefore, Dr. Yahiro was only partially disabled.

Dr. Yahiro first contended that surgery was the only principal duty of an orthopedic surgeon and that all his other duties were "incidental." *Id.* at 515. But the court found that the evidence belied this characterization. At the time Dr. Yahiro applied for disability benefits, he indicated that surgery accounted for only 25% of his time. *Id.* Post-disability, Dr. Yahiro was still able to have a non-operative orthopedic surgeon practice. *Id.* at 516. Though his position was not as lucrative as it had been pre-disability, Dr. Yahiro was still able to make a substantial living. *Id.* "Given the Court's determination that the principal duties of Plaintiff's occupation include more than just the performance of

surgery, and there being no claim that Plaintiff's disability precludes him from performing those other duties, the only conclusion under the terms of the policies is that Plaintiff is partially disabled." *Id.* at 517.

The court also rejected Dr. Yahiro's alternative argument, that he was *totally* disabled unless he could perform all the substantial and material acts necessary to the performance of his occupation. *Id.* "The policies clearly envision that where the insured 'is unable to perform one or more *but not all* of the principal duties of the regular occupation,' he is not totally disabled, but partially disabled." *Id.* at 517 (citation omitted).

Plaintiff urges this Court to disregard *Yahiro* because it rested on fundamental principles of insurance contract interpretation that differ in Maryland and California. The *Yahiro* court began its analysis by noting that "Under Maryland law, unlike the law in some other jurisdictions, there is no rule that an insurance contract is to be construed most strongly against the insurer." *Id.* at 514. But just how different Maryland and California are is open to some dispute. Like the *Dym* court, 19 F.Supp.2d at 1150 & n. 2, the *Yahiro* court noted that an insurance policy is only construed against the insurer where it is ambiguous. 168 F.Supp.2d at 514 (citing *North River Ins. Co. v. Mayor & City Council of Balto.,* 343 Md. 34, 40, 680 A.2d 480 (1996)).[1] Nonetheless, this Court recognizes the difference between Maryland and California law in determining what weight to give to *Yahiro.*

A number of other courts to consider the question of the meaning of total disability

---

1. The court in *Yahiro* actually writes the exact opposite, that "Only where there is an ambiguity in a policy is the contract to be construed *in favor of the insurer* as the drafter of the instrument." 168 F.Supp.2d at 514 (emphasis added). But it is clear both from context and from an examination of *North River,* which says that ambiguity is construed against the insurer, that the *Yahiro* court misspoke.

in a policy that also provided for partial or residual disability have reached the same conclusion: total disability means the inability to perform any of the principal duties of the insured's occupation. In addition to *Dym* and *Yahiro*, see *Helus v. Equitable Life Assurance Soc'y*, 309 F.Supp.2d 1170 (N.D.Cal.) (page references unavailable) (following *Dym* in holding that "the plain meaning of 'inability to engage in the substantial and material duties of your regular occupation,' when read together with the residual disability provision, is the inability to perform *all* of the duties")[2]; *Giampa v. Trustmark Ins. Co.*, 73 F.Supp.2d 22, 28 (D.Mass.1999) (listing cases); *Provident Life & Accident Ins. Co. v. Cohen*, 193 F.Supp.2d 845, 850 (D.Md.2002) ("When the insurance contract is considered as a whole, it is clear that where the insured 'is unable to perform one or more *but not all* of the principal duties of the regular occupation,' he is not totally disabled, but residually disabled."); *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 588 (8th Cir.2002) ("a person who can perform some but not all of his or her important duties has a 'Residual Disability' . . ., therefore in order to be eligible for total disability payments a person would be required to show that he or she was unable to perform any of those important duties").

In *Giampa*, the court focused on the facts rather than reaching a hard and fast rule for the total disability definition. There, the plaintiff was a chiropractor who had spent eighty-five to ninety-five percent of his time pre-injury treating patients by conducting examinations and performing manipulations or adjustments. 73 F.Supp.2d at 23. The rest of his time was spent managing his two chiropractic facilities. *Id.* After injuring his back, Giampa was no longer able to treat patients. *Id.* He devoted all his time to administrative duties, managing a number of clinics he and his partners opened. *Id.* This new administrative work was quite lucrative, and Giampa even increased his income by a factor of five. *Id.* Giampa claimed that his administrative duties had been incidental to his pre-injury chiropractic treatment practice. *Id.* at 25.

Though the *Giampa* court acknowledged the importance of reading the total disability clause in the context of the partial disability clause so as not to read the partial disability provision out of the policy, the court also stressed that total disability clauses should not be read so literally that the insured's ability to perform some business duty, no matter how small, would prevent a finding of total disability. *See id.* at 27–28 (citing *Fitzgerald v. Globe Indemnity Co.*, 84 Cal.App. 689, 258 P. 458 (1927)).

In light of this rule that total disability policies should be liberally construed, I conclude that a person in Giampa's position, who is disabled from engaging in eighty-five to ninety-five percent of his previous substantial and material duties as a treating chiropractor, is entitled to coverage under the total disability provision even if his disability does not prevent him from performing an incidental job duty. This conclusion is consistent with protecting the insured's expectations and his investment in the set of skills—that of a practicing chiropractor—for which he sought insurance. On the other hand, if a jury were to conclude that management duties were a substantial and material part of Giampa's pre-injury work, rather than an incidental part, the partial disability provision would provide the applicable standard set forth in *Erreca* and its progeny.

---

**2.** The *Helus* court, like the court in *Dym*, did not consider the California total disability

coverage. This interpretation would protect the contracting parties' intent that a partial disability only results in coverage when there is a certain income reduction.

*Id.* at 29. Thus, after balancing the policy of protecting the insured's expectations against the policy of giving meaning to every policy provision, the court found that there wa's a triable issue of fact as to whether Giampa's management duties were substantial and material duties of his pre-disability occupation or whether they were merely incidental. As a result, the court denied summary judgment. *Id.*

In *Yahiro,* the case involving the orthopedic surgeon, the court distinguished *Giampa.* "Here, no reasonable trier of fact could conclude that Plaintiff's non-surgical treatment of patients and his teaching duties were merely incidental to his surgical treatment of patients. These duties consumed a large percentage of his time and directly generated a significant portion of his income. Those duties, by any measure represented a substantial and material part of his pre-disability practice of orthopaedics." 168 F.Supp.2d at 518.

In contrast to the cases holding that where a policy includes both a total disability provision and a residual disability provision total disability must mean the insured's inability to do all the substantial and material duties of her occupation, Plaintiff cites *Dowdle v. Nat'l Life Ins. Co.,* 2003 WL 22047858 (D.Minn.2003), another case involving an orthopedic surgeon. Dr. Dowdle had an own occupation policy that defined total disability as the inability "to perform the material and substantial duties" of his occupation at the time of disability and partial disability as the inability to "perform one or more of the important daily activities of an occupation as

defined in this policy; or [the inability] to engage in an occupation ... for as much time as was usual prior to the start of the disability." *Id.* at *1. The question for the court to resolve was "whether or not Dr. Dowdle is entitled to total disability benefits under the terms of his Disability and Expense Policies under circumstances where he is unable to perform surgery but able to conduct office consultations and other non-surgical tasks." *Id.* at *2. Though Dr. Dowdle was unable to do surgery, he remained able to see patients, interpret data, and read x-rays, all of which he.had listed on his insurance application as specific duties of his occupation. *Id.* at *4. The court held that those duties "were manifestly secondary or supplementary tasks incident to the primary function of an orthopedic surgeon of conducting surgery." *Id.* Dr. Dowdle asserted that approximately 85% of his pre-disability practice involved surgical and surgical-related care. *Id.* at *1. The income disparity between Dr. Dowdle's pre-disability and post-disability practices was "strong evidence of the importance of his ability to perform surgery and its centrality to his occupation." *Id.* at *4. His post-disability earning capacity was only 14% of what it had been pre-disability. *Id.* In finding that Dr. Dowdle was totally disabled under the terms of his policy, the court also found that "Defendant's reasoning that qualification for a partial disability should preclude total disability coverage is fallacious and would render total disability coverage a nullity. If Dr. Dowdle's payment of additional premiums to secure extended residual insurance to cover partial injuries were to function to void the operation of his total disability coverage in circumstances where he qualified for total coverage, perversity would result." *Id.* at *5.[3]

---

3. Unlike in this case, where both the total disability provision and the residual disability provision refer to "important duties," the two

provisions in *Dowdle* used different language. While the residual disability provision referred to "important daily duties," the total

The court further noted that reading the total disability provision in this manner did not render the residual disability provision a nullity. As an example, the court noted that if Dr. Dowdle remained able to perform surgery, but could not perform another of the important duties of his profession, he would be partially disabled. *Id.* at *5 n. 3.

*Dowdle*, a Minnesota case, is consistent with *Fitzgerald v. Globe Indemnity Co. of New York*, 84 Cal.App. 689, 258 P. 458 (1927), a 1927 California Court of Appeal case. The policy at issue in *Fitzgerald* provided for total disability caused by disease "if such disease causes the insured to be totally and continuously unable to transact all duties pertaining to his occupation"; for intermediate disability if "unable to transact a major portion of all the duties pertaining to his occupation"; and for partial disability if "unable to transact a material portion of any or all duties pertaining to his occupation." *Id.* at 691, 258 P. 458. Though predating *Erreca* by fifteen years, the *Fitzgerald* court cited the same definition of total disability embraced by the later decision. "The weight of authority supports the view that provisions in accident policies for indemnity in the event the insured is totally or wholly disabled do not require that the accident shall render the insured absolutely helpless, but such provisions are construed as meaning such a disability as renders him unable to perform the substantial and material acts of his business or occupation in the usual and

customary way." *Id.* at 697, 258 P. 458. The court rejected the insurer's argument that, although the weight of authority generally supported construing total disability in that way in order to make the provision operative and prevent a forfeiture, the rationale did not apply where the policy provided for "various degrees of disability." *Id.*

No logical reason appears, however, why the same rule should not be applied where the policy provides for both total and partial disability in order to make the total disability clause "operative and to prevent a forfeiture" of the indemnity provided by that clause. In either case a literal interpretation of the total disability clause would defeat the very purpose of insurance against total disability, because it rarely happens that an insured is so completely disabled that he can transact no business duty whatsoever.

*Id.* The court, citing cases from Alabama, Kentucky, Texas, and Vermont, noted that other courts had applied the same rule in cases where the policy provided for both partial and total disability. *Id.* The court held that the plaintiff's engaging in certain business duties did not prevent a finding of total disability. "It cannot be said as a matter of law that the occasional transactions in which he engaged constituted the performance of 'the substantial and material acts of his business or occupation in the usual and customary way' or conclusive proof that, in the exercise of reasonable

---

disability provision referred to "substantial and material duties." Thus, the court stated, "Common sense dictates that a substantial and material duty of an occupation would also qualify as 'an important daily duty.'" 2003 WL 22047858, *5. Though the court did not say as much, it may be the case that an important daily duty would not necessarily rise to the level of a substantial and material duty, thus aiding in the argument that reading the total disability clause generously does not

eviscerate the residual clause. The argument is harder to make where, as here, the same word was used in both clauses. Nonetheless, given the long history of defining total disability in California, one can read the "important" in the total disability clause as "substantial and material." There is also an arguable difference between *"the* important duties" and *"an* important duty," or, to use the phrase used in the policy at issue, *"one or more* important duties."

care and prudence he was able to transact such business duties." *Id.* at 699, 258 P. 458. *See also Heald v. Aetna Life Ins. Co. of Hartford, Conn.*, 340 Mo. 1143, 104 S.W.2d 379, 383 (1937) (upholding the rejection of the defendant's proposed jury instruction that the plaintiff was "only partially and not wholly disabled if he was able to perform *any one* of the substantial duties pertaining to his occupation").

The interpretation of an insurance policy is a question of law. *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 18, 44 Cal. Rptr.2d 370, 900 P.2d 619 (1995). Courts must "look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." *Id.* "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." *Id.* Thus, the Court looks to the facts of this case in determining the meaning of the policy.

■ Notwithstanding the Court's categorical statement in its earlier order that where a policy provides for both total disability and residual or partial disability, total disability means the inability to perform all of the substantial and material duties of the insured's occupation (*see* Nov. 12 Order at 12), the Court declines to state any hard and fast rule regarding the definition of total disability. To the extent that the November 12 Order stated such a categorical rule, that Order is now vacated. The Court is now of the view that the better approach is to consider all the facts of the case, bearing in mind the sometimes inconsistent law of total disability that has been laid out above, in order to determine whether Plaintiff is totally disabled. To answer the question of whether Plaintiff is totally disabled from performing his occupation, the Court must first resolve what, precisely, Plaintiff's occupation is.

B. *Plaintiff's Occupation*

Under the policy, " 'Your Occupation' means the occupation in which You are regularly engaged at the time You become Disabled." (Berube Decl., Exh. A, at 23.) Thus, the first question the Court must answer at this time is what were the important duties of Plaintiff's occupation prior to his becoming disabled on December 17, 2001.

The first step to answering this question is determining what was the occupation in which Plaintiff was engaged at the time he became disabled. In answering this question, Plaintiff focuses on his being an "orthopedic surgeon." Plaintiff is a board-certified orthopedic surgeon and he contends that his own-occupation policy insured him as such. Plaintiff makes much of a letter he received from Paul Revere on May 22, 1989, in which Paul Revere wrote:

> Your policy, which includes coverage for 'Total Disability In Your Occupation,' provides that you would be considered Totally Disabled if, because of injury or sickness, you were unable to perform the important duties of Your Occupation. By 'Your Occupation,' we mean that occupation in which you are regularly engaged at the time disability begins. We understand your current occupation to be that of an orthopedic surgeon.

> If you were performing the important duties of an orthopedic surgeon immediately prior to the time disability begins, and then were unable to perform those duties, you would be considered unable to perform the important duties of Your Occupation. The fact that you could be working in some other occupation or specialty would not preclude the payment of Total Disability benefits.

(Declaration of Alan M. Gross, M.D. ("Gross Decl."), Exh. 2.) Plaintiff argues that this letter shows that he was insured as an orthopedic surgeon. Some courts have found that the definition of occupation can recognize specialization. *See, e.g., Dixon v. Pacific Mut. Life Ins. Co.*, 268 F.2d 812, 815 (2d Cir.1959), *cert. denied sub nom Pacific Mut. Life Ins. Co. v. Dixon*, 361 U.S. 948, 80 S.Ct. 403, 4 L.Ed.2d 381 (1960); *Blasbalg v. Massachusetts Cas. Ins. Co.*, 962 F.Supp. 362, 368 (E.D.N.Y.1997).

However, the Paul Revere letter makes clear that Plaintiff's insurance policy covered him for whatever occupation he was practicing at the time of disability. Furthermore, the letter notes that "[t]he actual payment of benefits, of course, would be determined in accordance with the provisions of your policy," (Gross Decl., Exh. 2), and the policy defines occupation in terms of the claimant's occupation at the time of disability.[4] Thus, what matters is the occupation in which Plaintiff was engaged at the time he became disabled, not the occupation in which he was board-certified or what occupation he might have practiced at the time he purchased the insurance policy. A board-certified orthopedic surgeon who at the time of her disability was working as a firefighter would not be deemed totally disabled as a result of her inability to perform all the important duties of an orthopedic surgeon. In

*Brumer v. National Life of Vermont*, 874 F.Supp. 60 (S.D.N.Y.1995), the plaintiff, who had worked for many years as a podiatric surgeon, had a total disability insurance policy in which "occupation" was defined as the actual duties a claimant performed "at the time such disability begins." *Id.* at 61. Despite the plaintiff's training and previous practice as a podiatric surgeon, the court held that his inability to perform surgery did not render him totally disabled because he had not performed surgery for at least thirteen months prior to his becoming disabled and instead was engaged in managing the practice. *Id.* at 65.

Plaintiff turns to the Department of Labor for the definition of an orthopedic surgeon's duties. According to Plaintiff, the Department of Labor defines orthopedic surgeon as one who:

Performs surgery to correct deformities, repair injuries, prevent diseases, and improve function in patients: Examines patient to verify necessity of operation, estimate possible risk to patient, and determine best operational procedure. Reviews reports of patient's general physical condition, reactions to medications, and medical history. Examines instruments, equipment, and surgical setup to ensure that antiseptic and aseptic methods have been followed. Performs operations, using variety of

4. Contrast the language of the Paul Revere letter with a letter the insured received from the insurer's agent in *Rosenberg v. Guardian Life Insurance Co.*, 510 So.2d 610 (Fla.Dist.Ct. App.1987). In *Rosenberg*, the insured was an ophthalmologist who, "although indisputably able to engage in a substantial part of the practice of his specialty (and successfully so doing), was indisputably unable to perform microsurgery." *Id.* at 611. The trial court, finding that microsurgery was only a nominal part of the insured's pre-disability duties, held that he was not entitled to total disability benefits. *Id.* Though acknowledging that it would, under the general definition of total disability under Florida law, agree with the trial court that the insured was not totally disabled, the appellate court found that the insurance policy at issue had been modified such that the insured met its definition of total disability. *Id.* The bargained-for modification was in the form of a letter that assured the insured that he would be entitled to total disability benefits even though he was "able to engage in a general or specialized medical practice which did not include the essential activities associated with a specialist in ophthalmic surgery." *Id.*

surgical instruments and employing established surgical techniques appropriate for specific procedures ... May specialize in correction or prevention of skeletal abnormalities, utilizing surgical, medical, and physical methodologies, and be designated Orthopedic Surgeon.... [5]

Though this definition may be helpful in identifying some of the typical duties of an orthopedic surgeon, it is only relevant here if Plaintiff was, in fact, engaged in these duties at the time he became disabled.

Unlike Plaintiff, Defendants take a purely quantitative approach to determining Plaintiff's pre-disability occupation. Defendants argue that Plaintiff was insured not for a job title, but for those occupational duties he actually performed at the time he became disabled. Thus, Defendants conducted an analysis of Plaintiff's billing codes to determine the duties in which he was engaged pre-disability. Defendants argue that Plaintiff's pre-disability occupation was as an orthopedic surgeon with a significant in-office and medical-legal practice. Plaintiff protests that he was insured for the specialty of orthopedic surgeon, and that the letter he received from Paul Revere indicates that he would receive total disability coverage notwithstanding his ability to perform the duties of some other occupation or specialty.

In *Oglesby v. Penn Mutual Life Insurance Co.*, 877 F.Supp. 872 (D.Del.1994), the District of Delaware considered whether the insured's "regular occupation" was, as the insured contended, interventional and vascular radiologist, or, as the insurer contended, general radiologist. The policy provided that the insured would be totally disabled where "You are unable to do the substantial and material duties of your regular occupation." *Id.* at 879. Regular

occupation was defined as "your usual work when total disability starts." *Id.* The insurer Penn Mutual raised two arguments regarding this question: "First, Penn Mutual contends that the policy broadly defines plaintiff's 'regular occupation' as a general radiologist, not the more narrowly circumscribed interventional and vascular radiologist. Second, Penn Mutual maintains that even if the policy allows for the latter construction, that it is of no moment; it argues that the substantial and material duties of Oglesby's regular occupation are the same before and after the onset of disability: general radiology practice." *Id.* The court rejected Penn Mutual's argument that the policy broadly defined regular occupation as general radiologist. First, the court found the policy's definition of regular occupation to be unambiguous, as its plain meaning indicated that the insured's regular occupation was his usual work at the time he became disabled, and that the insured would be found to be totally disabled where he was unable to do the substantial and material duties of that usual work. *Id.* at 881. "Therefore, if Oglesby's usual work was that of an interventional and vascular radiologist, and not a general radiologist, and he no longer could perform the substantial and material duties of that usual work, he would be entitled to Penn Mutual disability insurance benefits." *Id.* Furthermore, the court found that even if it were to find the definition of regular occupation ambiguous, the definition could still be interpreted such that Oglesby's regular occupation would be interventional and vascular radiologist. *Id.* Based on the rule that any ambiguity must be resolved in favor of the insured, the policy, if ambiguous, could define "regular occupation" as narrowly as the sub-specialty of interventional and vas-

---

**5.** Plaintiff cites a web site, http://oalj.dol.gov/public/dot/REFRNC/DOT 01B.HTM, which was allegedly accessed on February 11, 2004. The Court was unable to access the web site.

cular radiologist. _Id._ at 881–82. In addition, "[a]n agreed interpretation of the clause at issue by the parties, especially before the controversy arises, is an important aid in the interpretation of alleged uncertain terms." _Id._ at 882. Because Penn Mutual had, in a letter to the insured, interpreted "regular occupation" to mean interventional and vascular radiology, the ambiguity had to be resolved in favor of the insured. _Id._ Thus, the court held that "[u]nder either a plain meaning or ambiguity analysis, ... the Penn Mutual policy could define plaintiff's regular occupation as narrowly as the subspecialty of interventional and vascular radiology." _Id._ As a result, summary judgment was not granted for the insurer on the matter of Oglesby's regular occupation.

Penn Mutual alternatively urged the court to find as a matter of law that Oglesby's usual work both pre- and post-disability was that of a general radiologist. _Id._ This argument was based on an audit of Oglesby's pre-disability billing records, which showed that Oglesby spent only approximately 10% of his time working as an interventional and vascular radiologist. _Id._ at 882–83. "These data imply that the substantial majority of the plaintiff's pre-disability duties entailed general radiology and administrative function, responsibilities unaffected by his medical condition." _Id._ at 883. Oglesby challenged the accuracy of the billing data because of data entry errors; questioned the competency of Penn Mutual's auditor to categorize the billing data as interventional or non-interventional; and offered his testimony under oath that he spent 80–100% of his time pre-disability on his interventional and vascular radiology duties. _Id._ Oglesby offered evidence that he had cancelled his interventional and vascular procedures medical malpractice insurance post-disability as an indication of his shift in responsibilities. _Id._ The court found that there were genuine issues of material fact as to

Oglesby's regular occupation; therefore, summary judgment could not be granted on this question. _Id._ Thus, although the court found that the policy's definition of regular occupation could be interpreted narrowly, Oglesby's actual pre-disability duties had to be ascertained in order to determine his regular occupation.

As was noted above, it is important to determine what Plaintiff was actually doing before he became disabled, not only the specialty in which he had been trained. Nonetheless, that specialty is relevant to determining which of Plaintiff's pre-disability duties were important to his occupation where, as here, it is undisputed that Plaintiff was performing those important duties that are generally associated with an orthopedic surgeon, such as casting and performing surgery, up until the time he became disabled.

The insurance policy does, after all, refer to the duties of Plaintiff's "occupation," not just to his work-related duties. "Occupation" is defined as "[a]n activity or pursuit in which a person is engaged; esp., a person's usual or principal work or business." _Black's Law Dictionary_ 1106 (7th ed.1999). Plaintiff's occupation ought to have some independent value as something more than the amalgamation of random duties, though Plaintiff's title cannot be wholly determinative. One way of striking this balance is to treat the occupation of orthopedic surgeon as a limitation on what can be considered the important duties of Plaintiff's occupation, as opposed to defining those duties regardless of the duties in which Plaintiff actually engaged. In other words, if Plaintiff performed some duties at work that are outside the duties of an orthopedic surgeon (which are not limited to those duties enumerated in the Department of Labor definition), an occupation in which it is undisputed that Plaintiff was engaged at the time he became disabled,

then those duties would not be considered as part of the important duties of his occupation.

Some courts seem to focus on the substantial and material duties of a typical person pursuing the profession in which the plaintiff was engaged at the time of disability. *See, e.g., Austero,* 84 Cal. App.3d at 23 n. 21, 148 Cal.Rptr. 653 ("it is clear from the evidence that plaintiff was simply not performing what the jury considered to be the substantial and material duties *most attorneys* perform") (emphasis added). In *Dowdle,* the policy at issue provided total disability benefits where the insured was "unable to perform the material and substantial duties of an occupation." 2003 WL 22047858, *1. The own occupation rider defined "an occupation" as "the occupation of the Insured at the time a disability, as defined in the Total Disability provision of the policy, begins." *Id.* There, it was undisputed that Dr. Dowdle's occupation at the time he became disabled was "orthopedic surgeon." *Id.* at *3.

Other courts take a more functional approach. In *Yahiro,* for instance, the court noted that it "need look no further than Plaintiff's own experience, both before and after he stopped operating, to conclude that the principal duties of an orthopaedist encompasses more than just performing surgeries.... [A]t the time that he first applied for disability benefits, he indicated that 'surgery, operative care of patients' consumed just 25% of his time." 168 F.Supp.2d at 515. The *Yahiro* court credited the insurer's expert witness, who "offered statistics from the American Academy of Orthopedic Surgeons showing that 2.45% of the members of the Academy are in full-time, non-surgical clinical practices." *Id.* at 516. This statistic indicated that surgery was not the only important duty of an orthopedic surgeon. *Id.* Similarly, the *Giampa* court noted that most courts examine "the nature of the substantial and material duties that the claimant *actually performed* before his injury." 73 F.Supp.2d at 25 (emphasis added).

Thus, while it is undisputed that Plaintiff worked as an orthopedic surgeon pre-disability, it is imperative to examine the important duties he actually performed in order to determine whether, post-disability, he was able to continue working at the occupation he previously practiced. Pre-disability, Plaintiff was an orthopedic surgeon with a significant office practice. Plaintiff has never alleged as, for example, Dr. Oglesby did, that he spent upwards of 80% of his time pre-disability working in the sub-specialty of orthopedic surgery, or, namely, performing surgical duties. To determine whether he is totally disabled, it is necessary to determine the contours of Plaintiff's pre-disability practice in order to ascertain which duties were important and which were merely incidental and to determine whether he continues to perform his pre-disability duties in substantially the same manner. Three major categories of duties are at issue here: surgical duties, medical-legal duties, and in-office orthopedic duties. Each category will be analyzed in turn.

### C. *Plaintiff's Surgical Duties*

■ It is undisputed that Plaintiff ceased performing any and all surgical procedures on December 17, 2001. (Defendants' Uncontroverted Fact ("DUF") No. 6.) Plaintiff can no longer perform the surgeries he once did, including, inter alia, spinal surgery and joint replacements. (Gross Decl. ¶ 15.) He has no active staff privileges at any hospital and is not on call, whereas he used to be on call 24 hours per day. (*Id.* ¶ 17.) Though the parties agree that surgery was an important part of Plaintiff's pre-disability practice, there is some dispute as to how important a part it

was. On the physician questionnaire portion of the disability claim form he filed in January 2002, Plaintiff indicated that, at the time he became disabled, he spent 5–8 hours per week performing surgery, 5–8 hours per week on rounds and driving, 35 hours per week on office patient care, and 15 hours per week on management. (Berube Decl., Exh. C, at 79.) Thus, Plaintiff indicated at that time that surgery took up at most about 13% of his pre-disability time.[6] And surgery together with rounds and driving, neither of which Plaintiff could perform post-disability, took up at most about 24% of his time pre-disability.[7]

The parties dispute how much money Plaintiff's surgical work yielded before he became disabled. Christina Lubin, a CPT Analyst employed by Defendant Unum-Provident, conducted an analysis of Plaintiff's CPT (Current Procedural Terminology) Codes, codes used in the health care profession for billing purposes. According to Lubin's analysis, in the years leading up to Plaintiff's disability, surgical procedures never constituted more than 16.23% of his total billing. (Lubin Decl., Exh. C, at PRL CL 00918.)

In addition to being unable to perform surgery, Plaintiff is unable to perform other duties including packing and debriding wounds, performing c.p.r., suturing wounds and removing stitches, giving injections, injecting tendon sheaths and joints, aspirating joints, conducting microscopic evaluations, performing e.k.g.'s, setting fractures, applying bandages, applying splints, applying and fitting braces and orthotics, abscess drainage, and applying and taking off casts. (Gross Decl. ¶ 15.) Defendants do not here dispute Plaintiff's post-disability inability to do any of these tasks. (*See* M.S.J. at 2 ("even accepting as true Gross's stated limitations, he contin-

ues to perform a variety of the same important occupational duties today that he performed before his disability claim"); DUF No. 19 ("Gross reports he can no longer perform the following tasks because of his diabetes: packing wounds and debriding wound, performing c.p.r., suturing wounds, giving injections, injecting tendon sheaths, performing microscopic evaluations, performing e.k.g.'s, setting fractures, applying bandages, applying splints, applying and fitting braces and orthotics, abscess drainage, and apply[ing] and taking off casts.").) It is unclear whether, in providing the figure of 5–8 hours per week for the time he spent performing surgery, Plaintiff included any of these duties in the "surgery" category. Plaintiff's Procedure Productivity Reports covering the time period from January 1, 1997 through December 31, 2002, do, however, include under the heading "surgery" such procedures as sheath injections (CPT code 20550); injections of major joints (20610); casting (29075, 29425); cast removal (29700); splinting (29125); and debridement (29822, 29823, 29877, 29898). (Dr. Gross Procedure Productivity Reports, Lubin Decl., Exh. A.) In conducting her analysis, Lubin included all of these procedures, which Plaintiff indisputably no longer can perform, in arriving at the numbers that purportedly show that only 16.23% of Plaintiff's pre-disability billing was for surgical procedures. (*Id.*; Lubin Decl., Exh. C, at PRL CL 00918.) Plaintiff does not dispute that these procedures are properly labeled "surgical procedures." (*See* Plaintiff's Undisputed Facts ("PUF") No. 14.)

Lubin also analyzed how much time Plaintiff spent on surgical procedures pre-disability. According to Lubin's analysis, all procedures billed by Gross as "surgi-

---

6. Assuming Plaintiff spent 8 hours per week on surgery and 5 hours per week on rounds/driving.

7. Assuming Plaintiff spent 8 hours per week on both surgery and rounds/driving.

cal," including injections, casting, splinting, and debridement, accounted for less than 2% of those procedures performed and billed by Gross in each year leading up to his disability. (Lubin Decl., Exh. C, at PRL CL 00918.) The number of units billed analysis, like the charges billed analysis, included injections, casting, splinting, and debridement, as well as surgery. (*Id.;* Dr. Gross Procedure Productivity Reports, Lubin Decl., Exh. A.)

Plaintiff disputes the reliability of the CPT Code Analysis conducted by Christina Lubin. Plaintiff has moved to strike Lubin's declaration on the bases that Lubin has been inadequately qualified as an expert, that she relies on out-of-date data, and that the declaration includes codes that are labeled "miscellaneous" and "unidentifiable" without clarifying for what duties the codes were used. (Pls. Mot. To Strike Lubin Decl.) These categories were hardly negligible; in 2000, for example, the "unidentifiable" codes accounted for 47.44% of Plaintiffs billed units, and in almost every year analyzed the "miscellaneous" codes accounted for around 20% of Plaintiff's charges billed. (Lubin Decl., Exh. C, at PRL CL 00918.) Plaintiff further objects that the CPT Codes are an unreliable indication of the duties Plaintiff performed and billed for because: (1) the codes do not indicate whether he or his staff members performed a given procedure (Gross Depo., 15:13–16); and (2) the codes do not accurately reflect the number of castings Plaintiff performed because casting is generally "bundled" with other procedures and not billed separately, and casting may be bundled with a non-surgical procedure (*id.* at 495:9–501:19; 502:22–506:15; 509:7–510:2).

Though Plaintiff's assertions may create some dispute regarding interpreting the CPT Codes, they do not raise a material dispute. Plaintiff does not now and never has disputed the time breakdowns he pro-

vided on his disability claim form. Nor has Plaintiff ever offered any alternative calculation of the percentage of his income that is attributable to his surgical duties. As a result, no reasonable jury could find that Plaintiff's surgical duties accounted for 80%, 90%, or even 50% of Plaintiff's pre-disability practice. Thus, this case can be distinguished from *Giampa,* where the plaintiff spent 85–95% of his pre-disability time on his chiropractic duties, 73 F.Supp.2d at 23, and from *Oglesby,* where the plaintiff devoted 80–100% of his pre-disability practice to interventional and vascular radiology, 877 F.Supp. at 883. Here, where Plaintiff's non-surgical duties made up, even by the most conservative estimates, approximately 75% of his pre-disability practice, an assertion that Plaintiff's surgical duties were the only "important" duties of his occupation at the time he became disabled is untenable. Even in *Erreca,* the court's finding of total disability was based on the insured's ability to perform only incidental duties post-disability. *See* 19 Cal.2d at 396–97, 121 P.2d 689 (finding that a farmer was totally disabled where he was unable to perform manual labor of any kind or to supervise and manage farm operations because the duties he remained able to perform, such as negotiating loans and leases, were "the type of duties that are infrequently and intermittently performed and cannot be said to constitute the substantial and material acts of the occupation of farming").

While the Court does not rule out the possibility that, in a case like *Giampa* where one duty is so prevalent over all others that the inability to perform that one duty may amount to total disability, the Court cannot find that Plaintiff's inability to perform his surgical duties here means that he is totally disabled. As was discussed in Part III.A above, it is not necessary, in order to decide this case, to decide whether an insured must in all in-

stances be unable to perform all the important duties of his occupation before he can be found totally disabled. The Court is reluctant to render the residual disability clause meaningless, but it is equally reluctant to read the partial disability clause so broadly as to render the total disability clause essentially null, particularly given the well-established principle of reading an insurance policy in favor of the insured. Nonetheless, the partial disability clause would have no meaning at all if Plaintiff's inability to perform one important duty that did not constitute the majority of his pre-disability practice could mean that he was totally disabled.

For all these reasons, Plaintiff's inability to perform his surgical duties, standing alone, is insufficient to render him totally disabled. Thus, we must turn to Plaintiff's other duties to determine first, whether they were important duties of his occupation at the time he became disabled, and second, whether he is unable to perform them post-disability.

## D. Medical–Legal/Industrial Medical–Legal Work

 The question with respect to Plaintiff's Medical–Legal practice is whether it was an important duty of his pre-disability practice.

It is unclear what portion of Plaintiff's pre-disability practice was attributable to medical-legal work. Initially, Defendants argued that Plaintiff was not totally disabled because he was still able to perform medical-legal work, an important pre-disability duty. Defendants' basis for calling the medical-legal work important was that Plaintiff dedicated 15–25% of his time to this work. Thus, Defendants' Uncontroverted Fact No. 29 originally read "During the past 11 to 12 years, Gross dedicated approximately 15–25% of his time to medical legal evaluations." This fact was based on Dr. Gross's deposition testimony. At his initial deposition, conducted in October 2003, Dr. Gross testified that his best estimate of the portion of his time from 1990 to 1994 that he dedicated to medical-legal matters—acting as an agreed medical evaluator, conducting a medicolegal evaluation for the purposes of worker's compensation, or conducting an independent evaluation for the purposes of third party litigation—was 15 to 25%. (Gross 10/03 Depo. at 43:10–43:24, Exh. A. to Williams Decl.) Dr. Gross also testified that, during that time period, any time he spent appearing in court or in arbitrations was on top of that 15 to 25%. (*Id.* at 43:25–45:9.) Similarly, for the 1994 to 2000 time frame, Dr. Gross testified that he spent approximately the same 15–25% of his time, though probably somewhat less, on medicolegal tasks. (*Id.* at 74:23–75:2.) He further testified that from 1994 to 2000 he testified in court or at arbitrations between two and five times a year. (*Id.* at 75:3–:18.) Finally, Dr. Gross testified that his medicolegal practice took up a similar percentage of his time, though perhaps slightly less, from 1999 to 2001. (*Id.* at 132:12–133:1.)

However, after Plaintiff was asked those questions at his deposition, he determined, based upon an analysis of his Procedure Productivity Codes, that medical-legal work comprised only 1.4–1.6% of his practice (Gross Depo. at 446:20–447:4, 464:21–465:14, 452:14–24, Exh. 2 to Lilienstein Decl.) for the years 1999 through 2002. (*Id.* at 477:4–8.) As a result, Defendants altered DUF No. 29 to read "Between 1999 and 2002, non-medical-legal patient contacts made up 98% of Gross's medical practice and medical-legal work made up 1.4% to 1.6% of Gross's medical practice in terms of patient contacts."

Defendants make no reference to the 1.4–1.6 numbers in their Reply. The only mention of Plaintiff's medical-legal practice comes in the form of noting that Plaintiff is

still able to conduct medical-legal evaluations, dictate reports, do depositions, and make court appearances and arbitration appearances. (Reply at 3, 6.) But Plaintiff's ability to perform these functions (and Plaintiff disputes that he continues to perform them in the same way that he did pre-disability) is irrelevant unless Plaintiff's medical-legal practice amounted to an important duty of his pre-disability occupation.

■ Having conceded that at no time were more than 1.6% of Plaintiff's patient contacts medical-legal in nature, Defendants' sole remaining basis for arguing that Plaintiff's medical-legal work constituted an important duty of his occupation is based on Plaintiff's income from medical-legal work. Plaintiff argues that income has no place in this analysis. "Because occupational disability policies are 'designed to indemnify against loss of capacity to work, not against loss of income,' the fact that a claimant derives a 'larger income from a new occupation will not bar recovery under his disability policy.'" *Giampa v. Trustmark Ins. Co.*, 73 F.Supp.2d 22, 27 (D.Mass.1999) (quoting *Niccoli v. Monarch Life Ins. Co.*, 70 Misc.2d 147, 332 N.Y.S.2d 803, 805 (N.Y.Sup.Ct.1972), *aff'd*, 45 A.D.2d 737, 356 N.Y.S.2d 677 (N.Y.App.Div.1974)). Thus, the Court in its November Order noted that income is an "improper consideration" in determining whether a claimant is totally disabled from performing his own occupation. (Nov. Order at 13.) However, that a claimant's ability to earn a living post-disability is an improper consideration in determining whether he is totally disabled does not mean that income can play no role in the analysis. To the contrary, that an insured derives a substantial portion of his income from a certain occupational duty may be some indication that the duty is an important one.

When they amended DUF No. 29, Defendants did not amend DUF Nos. 27 and 28, which read, respectively, "In the year 2000, Gross's charges for 'Industrial & Medical Legal Evaluations' were more than 2½ times his charges for procedures related to surgery" and "In 2001, Gross's charges for this medical-legal work were more than five times his charges for surgical procedures." Defendants nowhere, however, allege what percentage of Plaintiff's total income was derived from such work. Furthermore, Plaintiff disputes these statements for two primary reasons. First, Plaintiff disputes the existence of a category of "industrial" evaluations and contends that "industrial" and "medical-legal" are not synonymous. (*See* Plaintiff's Uncontroverted Facts ("PUF") No. 27.) "Industrial" refers to Worker's Compensation, which is, in general, nothing but a different insurance payor. Within Worker's Compensation work, there is a subset of contested matters that will result in medical-legal work, such as evaluations, depositions, and arbitration or court testimony. Only that medical-legal work should be calculated in determining Plaintiff's income from this work. (Gross Depo. at 447:5–448:17.) Second, as was detailed in the discussion of Plaintiff's surgical duties, Plaintiff disputes Defendants' methods in calculating his billing from surgical procedures. (PUF No. 28.)

Plaintiff admits that his income from medical-legal work may be disproportionate to the percentage of his patient contacts it represents. (*See* Gross Depo. at 478:10–23 ("I believe that the med-legal dollars as a percentage may be slightly higher [than 1.4–1.6%], mainly because a contact for med-legal starts off at $500 versus an office visit of maybe 30 to 35").) According to Plaintiff, only those billing codes that begin "ML" ought to be counted in determining his income from medical-legal work. (*See* Gross Depo. at 451:3–22.)

Those codes, which signify medical-legal evaluations, are the codes Plaintiff used to arrive at the figure 1.4–1.6% for the percentage of patient contacts that were medical-legal. (*See id.*) The Court has conducted its own analysis of the billing codes to arrive at Plaintiff's "ML" code charges in the five years leading up to his becoming disabled.[8] For those years, the total ML charges ranged from approximately $90,000 in 1999 to approximately $206,000 in 1997, with a mean of about $150,000 per year from 1997 through 2001. These charges accounted for 3.77–12.53% of Plaintiff's total charges in those years, with a mean of 6.91%. In each of the last three years prior to Plaintiff's becoming disabled, the ML codes accounted for less than 4.5% of Plaintiff's total charges. Even adding in Plaintiff's arbitration appearances, court appearances, depositions, pre-arbitration meetings, and preparation for legal hearings, Plaintiff's medical-legal work accounted for, on average, about 8.4% of Plaintiff's yearly charges, and at most 5.8% of his charges in 1999, 2000, and 2001. Thus, though Plaintiff's income from his medical-legal work is, as he predicted, disproportionate to the percentage of his time in which he performed medical-legal work, such income is still hardly substantial as a percentage of Plaintiff's overall income.

Even based on income alone, Plaintiff's medical-legal duties were not important duties of his occupation prior to his becoming disabled. Moreover, when the income figures are considered in conjunction with what a small percentage of Plaintiff's patient contacts were attributable to medical-legal work and how infrequently Plaintiff appeared in court or at arbitrations, the conclusion is inescapable that Plaintiff's medical-legal work was a peripheral aspect of his pre-disability work. This work was not a routine part of his pre-disability practice. Like the *Erreca* insured's negotiation of loans and leases, signing notes and mortgages, talking with grain buyers, buying of supplies, and talking with his son, Plaintiff's medical-legal duties, though "neither trivial nor inconsequential, … are the type of duties that are infrequently and intermittently performed and cannot be said to constitute the substantial and material acts of the occupation of [orthopedic surgery as practiced by Plaintiff]." *Erreca,* 19 Cal.2d at 397, 121 P.2d 689.[9]

### E. *In-office Patient Care*

Plaintiff and Defendants dispute the extent to which Plaintiff remains able to conduct in-office patient care in the same way he could pre-disability. Given that Plaintiff cannot perform surgical tasks, and that Plaintiff's medical-legal work was not an important pre-disability occupational duty, whether Plaintiff remains able to perform in-office patient care is the crucial issue in determining whether Plaintiff is totally disabled.

■ The policy does not define what it means to be "unable to perform" a particular important duty. Given this omission,

8. See Exhibit A to the Lubin Declaration for the raw data the Court used.

9. Because the Court determines that, based upon the small portion of Plaintiff's pre-disability time and income that were attributable to his medical-legal work, such work was not an important duty of Plaintiff's occupation pre-disability, the Court need not reach the question of whether such work falls within the bounds of an orthopedic surgeon's occupational duties. As the Court discussed in *supra* Part III.B, it is possible that Plaintiff performed some work pre-disability that fell outside the occupational duties of an orthopedic surgeon. If so, such work cannot constitute an important duty of his occupation at the time he became disabled. The parties have not broached this issue with respect to Plaintiff's medical-legal work, and the Court need not address it here.

reference to the traditional California definition of disability is appropriate. Again, total disability is defined as "such a disability as renders the insured unable to perform the substantial and material acts necessary to the prosecution of a business or occupation in the usual or customary way." *Erreca*, 19 Cal.2d at 396, 121 P.2d 689. Thus, one is unable to perform an important or material and substantial duty if she is unable to perform that duty "in the usual or customary way." In *Giampa*, the District of Massachusetts noted that "[t]he approach of most courts in similar cases is to examine the nature of the substantial and material duties that the claimant actually performed before his injury and to inquire whether after injury he can continue to perform them " 'in the usual and customary way.' " " 73 F.Supp.2d at 25 (citing cases). In *Blasbalg*, the plaintiff, formerly a computer programmer, developed serious problems with his eyes. The court "credited Blasbalg's testimony that the customary and usual duties of a computer programmer require the constant, intensive use of the eyes because of the need for a substantial amount of scrolling and scanning while programming, coding, debugging and ensuring the correctness of the underlying data." 962 F.Supp. at 369. His post-disability work "in creating bar coding systems, developing Lotus spreadsheets and, in general, acting as a consultant, all of which basically required simple word processing," did not involve the intensive use of Blasbalg's eyes. *Id.*

To determine the "usual or customary way" of performing Plaintiff's in-office patient care duties, the Court looks to the way in which Plaintiff performed those duties before December 17, 2001, the date on which he became disabled, rather than looking to the ordinary practice of a person in Plaintiff's profession. As was discussed at length in *supra* Part III.B, the policy provides coverage should Plaintiff become totally disabled from performing the important duties of his occupation, defined as the occupation in which he was regularly engaged at the time he became disabled. Thus, what is relevant is Plaintiff's own usual and customary way of performing his in-office patient care duties.[10]

The Court looks at whether Plaintiff can perform his in-office patient care duties as a whole in his usual or customary manner, rather than considering each and every sub-duty and allowing a finding of total disability only if Plaintiff is unable to perform each and every one of those duties. To take the latter nitpicking approach would equate "total disability" with "utter helplessness," a view the California Supreme Court explicitly rejected in *Erreca*. 19 Cal.2d at 396, 121 P.2d 689. Furthermore, the approach this Court adopts properly resolves the ambiguity regarding the definition of "unable to perform" in favor of the insured.

Defining "unable to perform" a given duty as being unable to perform that duty in Plaintiff's "usual or customary way" respects the traditional California definition of total disability without reading the partial disability clause out of the policy.

■ Turning to the question of whether Plaintiff is able to perform his in-office patient care duties in his usual and customary manner, the Court first addresses

---

10. Of course, the Court is not issuing carte blanche for insureds to develop idiosyncratic ways of performing their occupations and then to claim disability if they become unable to perform in those idiosyncratic ways. As an initial matter, it is unlikely that such idiosyncracies would ever amount to more than incidental aspects of an insured's occupation. Furthermore, as was discussed in *supra* Part III.B, an insured's actual method of performing his own occupation must be constrained by objective notions of what the performance of that occupation ordinarily entails.

Plaintiff's argument that his post-disability in-office duties are fundamentally different from those he performed pre-disability because he is no longer performing them "as an orthopedic surgeon." To credit such an argument would be a back door way of finding Plaintiff to be totally disabled based entirely on a finding that Plaintiff is unable to perform surgery. The Court rejected such a finding above, and does so here as well. The policy focuses on occupational duties, not merely on an occupational title; therefore, the Court must take at least a partially functional view of the nature of Plaintiff's pre-disability occupational duties, rather than simply accepting that his inability to perform surgery post-disability has completely altered his in-office practice as well.

■ The relevant time period for assessing Plaintiff's level of disability is the time at which Defendants conclusively denied his total disability claim—on January 16, 2003. That denial is what Plaintiff is challenging with this action. Plaintiff argues that Defendants are committing an ongoing breach by failing to provide total disability benefits to him and by failing to investigate properly whether he is entitled to such benefits. The truth or falseness of such an allegation is irrelevant to the Court's task here. If there is ultimately a finding, whether by the Court or by a jury, that Plaintiff was not totally disabled at the time his claim was denied, Plaintiff can re-file his claim based on his allegedly worsening condition, and, if Defendants again deny his claim, take legal action once again. To allow Plaintiff here to challenge Defendants' actions or inaction following their denial of his claim would amount to sanctioning a moving target, whereby the

parties would be forced constantly to engage in new discovery regarding how Plaintiff is feeling today as compared to yesterday.[11]

■ There also must be some showing that Defendants were aware or should have been aware of Plaintiff's disability at the time they denied his claim for total disability benefits. However, it was not up to Plaintiff to make a legal argument regarding his disability at that time, but merely to make Defendants aware of his condition.

Essentially, the question is whether Plaintiff continues to work in his pre-disability occupation, albeit in a limited fashion, or whether he is essentially performing a different occupation altogether, although using some of the skills he acquired as an orthopedic surgeon. *See, e.g., Blasbalg,* 962 F.Supp. at 369 (finding that the plaintiff's using the knowledge he acquired as a computer programmer to earn a living post-disability "d[id] not equate to an ability to return to his specialized calling as a computer programmer"); *Niccoli v. Monarch Life Ins. Co.,* 70 Misc.2d 147, 152, 332 N.Y.S.2d 803 (N.Y.Sup.Ct.1972). In *Niccoli,* the court upheld the jury's finding that the plaintiff who, pre-disability, had been a practicing physician specializing in obstetrics and gynecology, was totally disabled notwithstanding his post-disability occupation as a sex education and family planning consultant for a hospital. 70 Misc.2d at 152, 332 N.Y.S.2d 803. "This court will not give a strained interpretation to the contract, nor foreclose the physician from the promised benefits of his contract because he has used some of his acquired

11. The Court is aware that some of Plaintiff's alleged post-disability difficulties with performing his in-office patient care duties may have arisen after January 16, 2003. However, as the motion before the Court is one for summary judgment, and as there has been no conclusive showing either way, the Court resolves the inference in favor of Plaintiff and assumes that the evidence pertains to the relevant time period.

knowledge and medical training in his new occupation. Lacking unequivocal language to such effect, this court will not compel an insured professional man to march backward toward obscurantism and ignorance in order to receive the benefits of a policy which he purchased to protect himself if he became incapable of practicing his chosen calling." *Id.*

In making this determination, it is irrelevant whether Plaintiff is able to earn a more substantial living post-disability than he did pre-disability. "Because occupational disability policies are 'designed to indemnify against loss of capacity to work, not against loss of income,' the fact that a claimant derives a 'larger income from a new occupation will not bar recovery under his disability policy.'" *Giampa*, 73 F.Supp.2d at 27 (quoting *Niccoli v. Monarch Life Ins. Co.*, 70 Misc.2d 147, 332 N.Y.S.2d 803, 805 (N.Y.Sup.Ct.1972), *aff'd*, 45 A.D.2d 737, 356 N.Y.S.2d 677 (N.Y.App. Div.1974)).

### 1. *Hours*

In his disability questionnaire, Plaintiff wrote that he spent 35 hours per week on office patient care both pre- and post-disability. (Berube Decl. Exh. C.) Furthermore, it is undisputed that the office is currently open four days a week (Monday through Thursday), ten hours a day. Plaintiff is at his office for most of the time when it is open, though he may arrive late or leave early. (Gross Depo. at 396:21–397:4.)

Plaintiff contends that, although he may spend approximately the same amount of time in the office on a weekly basis post-disability as he did pre-disability, he spends significantly less of that time actually working. Since he became disabled, Plaintiff has been forced to take frequent breaks, once or twice an hour. He sits or lies down on his office manager's sofa or goes into his office and gets on the computer. During these breaks, he frequently puts his leg up. Patients are slotted accordingly. (Gross Depo. at 402:11–20; Donovan Depo. 136:12–137:5; 138:19–139:5.) Plaintiff estimates that, while he is physically in the office for about 40 hours per week, he only spends half of that time actually working. (Gross Depo. at 466:7–18.) Defendants argue that the decline in how much time Plaintiff spends with his patients is irrelevant so long as he is still able to see patients in his office, one of his important pre-disability duties, but the decline is certainly relevant to the question of whether Plaintiff is performing that duty in his usual or customary manner.

Plaintiff does not see patients on Fridays, though he did up until very recently sometimes spend time in the office on Friday for depositions and other matters.

### 2. *Number of Patients* [12]

In an interview with Defendants' field representative on March 12, 2002, Plaintiff indicated that pre-disability he saw 40 to 65 patients per day. (Field Report, Berube Decl., Exh. E, at PRL CL 00885.) Plaintiff told the field representative that he continued to see the same number of in-office patients post-disability. (*Id.* at PRL CL 00886.) In supplemental statements filed with Defendants and dated May 20, 2002, and October 4, 2002, Plaintiff wrote that there had been no change in his activities and in his ability to perform his occupational duties since he filed the initial

---

**12.** At Plaintiff's deposition, one Dealie Park, a physician's assistant Plaintiff hired in October 2003, was the subject of much testimony, as Ms. Park's hiring affected the number of patients Plaintiff personally saw during the course of a week. Because Dealie Park was in Plaintiff's employ only for a very short period of time, and was only hired after Plaintiff's claim was denied, the Court does not consider the testimony regarding Ms. Park.

claim form. (Berube Decl., Exhs. F & G.) In an October 17, 2003 declaration, Plaintiff declared that at that time he saw 40–45 patients per day. (Gross Decl. ¶ 19, Williams Decl., Exh. C.) At his October 20, 2003 deposition, Plaintiff testified that there had been some slow down in the number of patients he saw each day. (*See* Gross Depo. at 176:18–177:19.) Though there is some dispute about the number of patients Plaintiff was able to see post-disability, Plaintiff's primary objection concerns not the number of patients, but the capacity in which Plaintiff saw those patients. Again, Plaintiff argues that he did not see these patients in the capacity of an orthopedic surgeon. As was discussed above, the Court rejects arguments that merely rehash Plaintiff's argument that he is totally disabled because he can no longer perform surgery. Furthermore, to the extent that this argument concerns the actual duties Plaintiff performed for his patients in his office, the Court will address those duties in the next section.

### 3. *In–Office Patient Care Duties*

It is undisputed that, post-disability, Plaintiff is unable to perform a whole host of duties, including packing and debriding wounds, performing c.p.r., suturing wounds and removing stitches, giving injections, injecting tendon sheaths and joints, aspirating joints, conducting microscopic evaluations, performing e.k.g.'s, setting fractures, applying bandages, applying splints, applying and fitting braces and orthotics, abscessing drainage, and applying and taking off casts. (Gross Decl. ¶ 15.)[13] Though he can still prescribe medicine, Plaintiff cannot write out the prescriptions himself. (Gross Decl. ¶ 15). It is undisputed that pre-disability, Plaintiff was responsible for reviewing and interpreting all x-ray films, and that post-disability, Plaintiff can look at the films

grossly, but needs an associate or radiologist to look at the films for corroboration. While Plaintiff never sutured wounds in his office pre-disability, he did remove sutures in the office pre-disability (Gross Depo. at 60:12–14), and he is now unable to remove sutures.

A key issue is Plaintiff's ability to conduct patient examinations. Plaintiff always sees all new patients face to face for an initial exam. (Donovan Depo., 43)21–45:21.) At his deposition, Plaintiff described some of the typical aspects of a patient examination as follows: "Basically, any physical exam as documented involves looking at somebody: appearance, posture, looking for deformities, then you touch them, palpation for tenderness, you go through range of motion, motion activities, you do a sensory reflex and motor examination." (Gross Depo. at 344:19–25.) Range of motion does not involve touching the patient, but instead seeing what the patient can do on her own. (*Id.* at 345:4–9.) There is also a palpation aspect, during which the doctor (or an assistant) feels for crepitus, tenderness, affusion, heat, warmth, or erythema, for example. (*Id.* at 345:10–346:1.) Sometimes there is an overlap between range of motion and palpation; in other words, the doctor will touch the patient to feel for problems while the patient is going through a range of motion. (*Id.*) The doctor also reviews the medical records.

Defendants assert, based on Plaintiff's deposition testimony, that Plaintiff continued post-disability to perform, on his own, all of these aspects of a patient examination. At the deposition, Plaintiff described these procedures in the context of being asked about an examination of a medical-legal patient. (*See* Gross Depo. 344:2–4.) After Plaintiff completed this description, Defendants' counsel asked, "And these are

---

**13.** Many of these duties were discussed in the section on Plaintiff's surgical duties.

done currently by you in these medical-legal exams?" (*Id.* at 346:2–3.) Plaintiff responded, "Every exam, not just medical-legal." (*Id.* at 346:4.) The deposition then turned to a discussion of whether there were differences between examinations of medical-legal patients and other patient exams. In this context, Plaintiff's response cannot be taken to indicate conclusively that he himself performed each and every aspect of the patient exam post-disability. Thus, Plaintiff's assertion that he was not able to perform some of these procedures on his own does not necessarily conflict with his deposition testimony. Plaintiff asserts that his staff had to perform some of these tasks for him.

■■■ Furthermore, that an insured's business keeps running successfully does not preclude a finding of total disability where people other than the insured must perform all the essential tasks of the business. In a 1965 opinion, the Pennsylvania Supreme Court stated the following rule for determining total disability in the context of a proprietor's ability to perform the duties necessary to her business's operation: "the insured must prove that the personal efforts that he himself is capable of making in the operation of the business are insubstantial and unimportant, by reason of their low quality or quantity, in relation to the character and amount of work required to carry on the business." *Cobosco v. Life Assurance Co. of Penn.*, 419 Pa. 158, 166, 213 A.2d 369 (1965). "[T]he fact that the business may be carried on by others, and that no one can prohibit the owner or proprietor from participating to whatever degree he is able and desires, does not bar the insured from recovering when, in fact, his participation is insubstantial and unimportant." (*Id.* at 167, 213 A.2d 369.) Mrs. Cobosco was a hardware merchant who, pre-disability, operated almost entirely on her own a hardware store she owned. *Id.* at 162, 213 A.2d 369. Her duties ranged from attend-

ing hardware shows to stocking shelves and required her to climb a ladder and to handle heavy items. *Id.* Post-disability, Ms. Cobosco's ability to attend to the store was limited to the following: "she could come to the store on three days of the week, on each of these days she could remain there for one to three periods lasting from twenty minutes to one hour, during which time she could do light selling, dictate policy, and supervise others." *Id.* Most of the duties Mrs. Cobosco formerly performed on her own had to be performed by various members of her family. *Id.* On these facts, the court upheld the jury verdict, holding that the jury could have reasonably found that Mrs. Cobosco was totally disabled. *Id.* at 168–69, 213 A.2d 369. *See also Mutual Life Ins. Co. of New York v. Binion*, 72 Ga.App. 173, 177–78, 33 S.E.2d 448 (1945) ("Hiring others to operate a business is not personal operation of the business. The fact that the insured is able to go to his office or place of business for a short time each day does not render disability less than total if in fact he could do no work there.").

In *Thompson v. New York Life Ins. Co.*, 166 So. 863 (La.Ct.App.1936), the court found that the insured was totally disabled, notwithstanding his continuing to work for ten months after becoming totally disabled, because "[h]e was only able to function as superintendent with the assistance of his associates, whose normal duties did not demand that they do so; and at serious risk of precipitating physical collapse to himself, a collapse which did overtake him a short time after leaving the company." *Id.* at 866. His continuing in his work did not preclude a finding of total disability where "common care and prudence required him to desist from transacting any such business." *Id. See also Cox v. Washington Nat'l Ins. Co.*, 520 S.W.2d 76, 79 (Mo.Ct.App.1974).

However, where a claimant still substantially performs his occupation on his own, albeit with some help and some difficulty, he will not be totally disabled. *See Provident Life & Accident Ins. Co. v. Harris,* 234 Ky. 358, 28 S.W.2d 40, 42 (1930). In *Harris,* "the evidence showed that the appellee, although helped at times in the discharge of his duties, has during most of the time performed them all himself. He is earning the same wages as he did prior to the accident, and, although he experiences more difficulty in getting his work done, yet as a matter of fact he is doing it. This is not a case where the injured party performs only a part of the work he did prior to his accident or performs only fitfully all of such tasks. It is a case where day in and day out the injured party is found at his labor performing all or substantially all of his duties." *Id.; accord New York Life Ins. Co. v. Torrance,* 224 Ala. 614, 141 So. 547, 552 (1932).

The Court does not offer the cases regarding assistance to displace the "usual and customary way" standard, but merely as a guide to what consideration ought to be given to Plaintiff's assertions that he requires help to perform occupational duties that, pre-disability, he performed on his own.

Here, the evidence Plaintiff offers for his needing help to perform patient examinations does not relate to the aspects of patient examinations that he detailed in his deposition. Plaintiff cites paragraph 15 of his declaration, which refers to a number of procedures for which he requires staff assistance, but does not mention palpation, range of motion, or the other patient examination procedures. (*See* Gross Decl. ¶ 15.) Plaintiff does attach a spreadsheet delineating his pre- and post-disability duties, but that spreadsheet does not specify time and is not particularly clear. (*See* Gross Decl., Exh. 5.) Plaintiff claims that he is unable post-disability to perform pal-

pations, but the evidence he cites does not support this claim. It is possible that pages 381 to 383 of Plaintiff's deposition, portions of which Plaintiff cites, support this assertion, but Plaintiff failed to provide those pages to the Court.

However, it is undisputed that Plaintiff is unable to do measurements, Jamars, and grip strengths himself post-disability, whereas he performed these duties independently pre-disability. Furthermore, it is undisputed that Plaintiff no longer does manipulations or personally applies casts and splints. Plaintiff makes the casting decisions and his assistant Thomas Donovan applies the casts. Plaintiff still sees patients with stress fractures, toe fractures, and finger fractures that require splinting or bunny taping. Again, Mr. Donovan actually performs the splinting or bunny taping. Plaintiff has not seen fracture reduction patients since December 17, 2001.

### 4. *Plaintiff's Medical Condition*

Plaintiff provides evidence of his medical condition. Defendants protest that Plaintiff's condition is irrelevant, but this information is relevant to support Plaintiff's assertions regarding his inability to perform certain tasks, his need to take frequent breaks, and his purported inability to perform his duties in his usual and customary manner.

In addition, Plaintiff's condition is relevant if Plaintiff continued working against his physicians' advice. Plaintiff's performance of certain duties does not prevent a finding of total disability where Plaintiff performed those duties against his doctors' advice. "The ultimate fact to be determined is not what the plaintiff actually did in the way of business duties but what, in the exercise of common care and prudence, he was reasonably able to do. Proof of what he did is merely evi-

dence tending to show his ability to do . . . ." *Fitzgerald v. Globe Indemnity Co. of NY*, 84 Cal.App. 689, 697, 258 P. 458 (1927). "The fact that the insured may do some business duties during the time for which he claims indemnity for total disability or even the fact that he may be physically able to do so is not conclusive evidence that his disability is not total, if reasonable care and prudence require that he desist." *Id.*

Plaintiff suffers from Type 2 Diabetes Mellitus. He has sensory neuropathy in his hands, which causes his hands to cramp. Plaintiff also suffers from retinopathy, which causes blind spots in his eyes, and from Charcot foot, meaning that the arch in his right foot is permanently collapsed. His treating physician has recommended that Plaintiff not stand for more than one half hour at a time. (Kayne Decl., Exh. 1.) "Although not performing surgery it is my understanding that, by necessity, Dr. Gross continues to work in his office standing on his feet all day long going from room to room. This behavior is ill-advised and places him at high risk for loss of limb due to Diabetic neuropathic ulcers that can lead to gangrene and amputation." (*Id.; see also* Smith Decl. ¶ 12 ("I have informed Dr. Gross that by working the schedule he does, and by standing as much as he does, he risks serious health implications with his foot.").) Dr. Kayne has also stated, "I have informed Dr. Gross that in my opinion he should not be working as much as he currently does." (Kayne Decl. ¶ 10.) The doctor who has treated Plaintiff's Charcot foot has made a similar statement. (Smith Decl. ¶ 10.) Plaintiff's continuing to work his schedule could lead to kidney failure, which could impact Plaintiff's life span, whereas Plaintiff would have a normal life span if he stopped working and got his diabetes under control (Kayne Decl. ¶¶ 11–12.) Defendants argue that what Plaintiff should do is unimportant; all that matters is what

he is doing. But the authority cited above regarding working against a physician's advice clearly contradicts this position.

### 5. *Conclusion—In-Office Practice*

Looking to the policy and to the California common law definition of total disability, and based on the facts before the Court, there is at least a triable issue of fact as to whether Plaintiff was totally disabled when his claim was rejected. The question to be resolved is this: Was Plaintiff unable to perform his in-office patient care duties in his usual or customary way at the time his claim was rejected?

## IV. DISCUSSION—RESIDUAL DISABILITY

The parties also dispute whether Plaintiff is residually disabled. The dispute centers on Plaintiff's income loss—or lack thereof—since becoming disabled. This question is stayed pending determination of whether Plaintiff is totally disabled.

## V. CONCLUSION

The sole remaining issue regarding the total disability determination is whether Plaintiff's disability prevents him from performing in-office patient care in his "usual or customary way." On the facts before the Court at this time, a reasonable jury could answer this question in the affirmative. The parties are invited to move for summary judgment on this question if they find it appropriate; otherwise, this question will be tried before a jury. To guide the parties as they proceed, here is a summary of the conclusions the Court has reached in this order.

1. The Court vacates the November 12 Order's definition of total disability.

2. Plaintiff's objections to the Lubin Declaration go to weight, not to admissibility.

3. On the facts presented here, Plaintiff's inability to perform surgery and related duties, standing alone, is insufficient to render him totally disabled.

4. Post-disability income is an improper consideration in determining whether a claimant is totally disabled. However, it is relevant to the question of whether a given occupational duty is important.

5. Based on the time Plaintiff spent on it and the income he earned from it, Plaintiff's medical-legal practice was not an important duty of his occupation at the time he became disabled.

6. The crucial issue is whether Plaintiff remains able to perform in-office patient care in his "usual or customary way."

7. The Court looks to Plaintiff's in-office patient care duties as a whole, not to each individual duty.

8. That Plaintiff is no longer seeing patients "as an orthopedic surgeon" does not compel the conclusion that he is unable to perform his in-office patient care duties in his usual or customary way.

9. The relevant time for assessing total disability is January 16, 2003, the date on which Defendants denied Plaintiff's claim.

10. Defendants must have been on notice of Plaintiff's condition when they denied his claim, but Plaintiff did not have to make a legal argument that he was totally disabled.

11. If Plaintiff has seen fewer patients and worked fewer hours since he became disabled, that is relevant to the question of whether he sees patients in his usual and customary manner.

12. Whether Plaintiff receives help to perform his patient care duties is relevant to whether he performs those duties in his usual and customary manner.

13. Plaintiff's medical condition may be relevant to corroborate his asserted inability to perform his patient care duties in his usual and customary way and to the question of whether Plaintiff continued to work against his physician's advice.

Defendants' Motion for Partial Summary Judgment Regarding Total Disability Issue in Plaintiff's Breach of Contract Claim and Total and Residual Disability Issues in Defendants' Counterclaim is DENIED. The residual disability issue is stayed pending a determination as to total disability.

IT IS SO ORDERED.